George M. AUSTIN, M.D., Plaintiff,

v.

James V. McNAMARA, M.D., James R. Saint John, M.D., Richard B. Brown, M.D., Paul J. Schweinfurth, M.D., Thomas Jones, M.D., Santa Barbara Cottage Hospital, Santa Barbara Cottage Hospital, Inc., and Does 1 through 5, inclusive, Defendants.

No. CV 88–04268 RG (Kx).

United States District Court, C.D. California.

Feb. 20, 1990.

David M. Harney, Thomas Kallay and Carol Kloke of Harney & Packer, Los Angeles, Cal., for plaintiff George M. Austin, M.D.

Marvin A. Bauer and Jeanette Nelson of Bauer, Harris & McEvoy, Santa Barbara, Cal., for defendant James V. McNamara, M.D.

James Herzog and David R. Fisher of Law Offices of James P. Herzog, Los Angeles, Cal., for defendant Thomas Jones, M.D.

Keith M. Crouch of George McDonald & Associates, Los Angeles, Cal., for defendant Richard B. Brown, M.D.

Curtis E. Aldendifer and Jeffrey C. Moffat of Bonne, Jones, Bridges, Mueller, O'Keefe & Hunt, Los Angeles, Cal., for defendant James R. Saint John, M.D.

Michael A. O'Flaherty and Lynn Ovando of O'Flaherty & Belgum, Los Angeles, Cal., for defendant Paul J. Schweinfurth, M.D.

Catherine Kunkel–Watson of Rushfeldt, Shelley & Drake, Sherman Oaks, Cal., for defendant Santa Barbara Cottage Hospital and Santa Barbara Cottage Hospital, Inc.

GADBOIS, District Judge.

Plaintiff George M. Austin, M.D. ("Dr. Austin"), is a neurosurgeon and brings this action alleging violations of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1, 2 (1982), and pendent state business tort claims against five individual physicians and the Santa Barbara Cottage Hospital ("Cottage Hospital"). Plaintiff's claims arise out of the alleged conspiracy and concerted actions of the individual Defendant physicians to shut down Dr. Austin's neurosurgery practice in Santa Barbara by having his staff privileges suspended at Cottage Hospital.

The three Motions for Summary Judgment pursuant to F.R.Civ.P. 56 brought by the various Defendants came on regularly for hearing before this Court on October 30, 1989. Defendant Cottage Hospital brings the "main" Summary Judgment Motion, asserting that it is immune from federal antitrust liability by virtue of the provisions of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C.A. §§ 11101 *et seq.* (West Supp.1989). Alternatively, Defendant Cottage Hospital

argues that summary judgment is appropriate since Plaintiff Dr. Austin is unable to invoke Sherman Act jurisdiction on the facts of his case.

All five individual Defendant physicians join in Cottage Hospital's Motion for Summary Judgment. Defendants Dr. Jones and Dr. St. John each bring their own Motions for Summary Judgment on grounds very similar to those asserted by Defendant Cottage Hospital. Finally, Defendant Dr. Jones joins in Defendant Dr. St. John's Summary Judgment Motion.

Having carefully considered the voluminous moving papers, opposition papers, declarations, exhibits, and the oral arguments of counsel, the Court grants the Summary Judgment Motions of the Defendants Cottage Hospital, Dr. Jones, and Dr. St. John for the reasons enumerated below.

## FACTUAL BACKGROUND

Plaintiff Dr. Austin spent the first 30 years of his medical career in academia as an instructor and professor of neurosurgery at the Universities of Pennsylvania, Oregon, Southern California, and at Loma Linda University School of Medicine. Upon retiring at the age of 65 from the chairmanship of the Loma Linda Neurosurgery Department, Dr. Austin moved to Santa Barbara, California in 1981 to establish a private practice for the first time since becoming a board-certified neurosurgeon back in 1952.

When Plaintiff arrived in Santa Barbara in 1981, there were only three other practicing neurosurgeons in the area, Defendants Dr. Brown, Dr. St. John, and Dr. Schweinfurth. The patient-to-neurosurgeon ratio in Santa Barbara was already close to saturation when Plaintiff arrived to set up shop. Defendant Dr. Jones came to Santa Barbara a few months after the Plaintiff and established his own neurosurgery practice.

Plaintiff Dr. Austin held staff privileges at a number of local hospitals, among them, Defendant Cottage Hospital. Cottage Hospital is the best-equipped hospital in the Santa Barbara area for neurosurgery. All five of the individual doctor Defendants were on staff at Cottage Hospital during the relevant time period. The Plaintiff's claims for violations of the Sherman Act, intentional interference with prospective business advantage, and conspiracy to commit these acts are based on the following factual allegations:

Dr. Austin alleges in his Complaint that although the Defendant neurosurgeons often "covered" patients for each other, shortly after his arrival, all of them refused to "cover" for the Plaintiff. In his deposition, however, Dr. Austin admits that Defendants Dr. Brown, Dr. Jones, and Dr. Schweinfurth did in fact "cover" for him, but only a few times over a seven-year period. Defendant Dr. St. John is the only one who has refused to "cover" for the Plaintiff from the outset and has never done so. In October of 1986, Dr. Brown sent the Plaintiff a letter confirming that he would never "cover" for Dr. Austin again.

The Plaintiff admits that "covering" patients for other physicians is merely professional courtesy and that there is no legal or ethical obligation to do so. With the exception of Dr. St. John, the other Defendant neurosurgeons testified in their depositions that they "covered" for the Plaintiff when their schedules allowed them to, and attributed any refusals to scheduling conflicts or last-minute notice. Plaintiff Dr. Austin admits that he has refused to "cover" or assist the various Defendant neurosurgeons on occasion due to scheduling conflicts.

As additional evidence of the conspiracy against him, Plaintiff alleges that Defendants Dr. Jones and Dr. St. John "openly demeaned [his] work to nurses on staff at Cottage Hospital in order to develop animosity over [sic] him." Dr. Austin also contends that the Defendant neurosurgeons would "aggressively attack" his judgment at various monthly Cottage Hospital neurosurgical group meetings. The Defendant neurosurgeons counter that there were legitimate concerns with the Plaintiff's treatment of patients at Cottage Hospital.

On January 1, 1986, Defendant Dr. McNamara, an internal medicine specialist, became Chief of Staff at Cottage Hospital and Defendant Dr. Brown became the Chief of Surgery. Plaintiff alleges that this turn of events, in addition to the fact that Defendant Dr. St. John's wife sat on Cottage Hospital's Board of Directors, gave the Defendants the power and ability "to expedite the process of excluding [him] from the practice of neurosurgery in Santa Barbara."

On January 29, 1986, Defendant Dr. McNamara, as Chief of Staff, informed Plaintiff that an internal evaluation of his cases would take place. This was done in response to concerns expressed by the nursing and technical staffs, as well as Dr. Austin's colleagues, about the quality of care some of the Plaintiff's patients were receiving. Defendant Dr. McNamara instructed his Chief of Surgery, Defendant Dr. Brown, to review all of the Plaintiff's cases in 1985.

On April 24, 1986, Defendant Dr. Brown presented his findings to Cottage Hospital's Surgical Audit Committee ("SAC"). Defendant Dr. Schweinfurth sat as a member of the SAC. In his presentation, Dr. Brown outlined what he perceived to be deficiencies in 26 out of the 30 cases handled by the Plaintiff in 1985. Dr. Brown also presented three additional "problematic" cases from 1986 to the SAC. The SAC voted to have an outside reviewer further evaluate Dr. Austin's charts and to continue monitoring his work.

On June 10, 1986, Chief of Staff Dr. McNamara requested Cottage Hospital's Medical Executive Committee ("MEC") to establish an *Ad Hoc* Committee ("AHC") of five doctors to investigate concerns voiced by the staff that Plaintiff Dr. Austin was providing substandard care to his patients at the Hospital. Defendant Dr. Jones served on the AHC which met four times between June 25, 1986 and August 15, 1986 to discuss the possible revocation of Plaintiff's staff privileges at Cottage Hospital.

In addition to the internal investigation by the AHC, Defendant Dr. McNamara also had an external, independent review conducted by Dr. Sidney Tolchin and Dr. David G. Sheetz, two neurosurgeons appointed by the California Medical Association. Dr. Tolchin and Dr. Sheetz spent a day at Cottage Hospital talking to various staff members and reviewing Dr. Austin's charts. The outside reviewers also spent an hour and a half interviewing Dr. Austin himself. Both Dr. Tolchin and Dr. Sheetz gave the Plaintiff a generally favorable evaluation, but both expressed serious concerns in some areas and recommended further monitoring.[1]

On August 15, 1986, after considering the findings of the independent reviewers, the *Ad Hoc* Committee voted to establish a six-month period of monitoring of the Plaintiff's cases by the Surgical Audit Committee. As a member of the AHC, Defendant Dr. Jones recommended and voted for the continued monitoring. From August 15, 1986 to November 16, 1986, five of the Plaintiff's cases were reviewed by the SAC. Defendant Dr. St. John reviewed three cases and Defendants Dr. Brown and Dr. Jones reviewed one each.

On November 17, 1986, Defendant Dr. McNamara, as Chief of Staff, informed Plaintiff that his staff privileges at Cottage Hospital were summarily suspended. This action was taken after Dr. McNamara had presented certain cases handled by Dr. Austin to the Medical Executive Committee. These cases had been monitored by members of the SAC since early October of 1986. On November 19, 1986, Plaintiff appeared before the MEC to defend his actions in the three cases that Defendant Dr. St. John had reviewed and found substandard, as well as the case of patient C.P. that Defendant Dr. Jones declared substandard. Following the discussion, the MEC passed a motion recommending to the Board of

---

1. Plaintiff also asserts that the outside reviewers may have been part of the alleged conspiracy against him based solely on the fact that he was not present when Dr. Tolchin and Dr. Sheetz met with Defendants Dr. McNamara, Dr. Brown, and Dr. Jones at the beginning of their day-long review.

Directors corrective action to revoke the clinical privileges of Dr. Austin. Chief of Staff Dr. McNamara notified Plaintiff of this action by a letter dated November 20, 1986.

In a letter dated December 3, 1986 ("December 3rd Letter"), Dr. Robert A. Reid, Vice President of the Medical Staff, advised Plaintiff that the reason for the recommendation was that his professional conduct was lower than the applicable standard of practice. The December 3rd Letter set out 14 specific categories of allegedly substandard practice with patient chart numbers designated as to each specification. The December 3rd Letter alleges 103 instances of substandard professional conduct on the part of Dr. Austin.

California Business & Professions Code § 805 requires any disciplinary action affecting a physician practicing in the state be reported to the California Board of Medical Quality Assurance ("BMQA"). Defendant Cottage Hospital complied with this requirement on January 13, 1987 by sending a "Health Facility Reporting Form 805" containing the Plaintiff's name, a description of the reasons for the summary suspension, and other appropriate information to the BMQA.

Plaintiff Dr. Austin's suspension from Cottage Hospital lasted approximately seven months, from November 19, 1986 to June 3, 1987. During this time, Plaintiff continued to enjoy staff privileges at several other local hospitals including St. Francis, Goleta Valley, Santa Ynez, Lompoc, and Ojai. Plaintiff continued to see patients during this time period and performed neurosurgery at St. Francis Hospital while suspended from Cottage Hospital.

Plaintiff requested and received a hearing before the Judicial Review Committee ("JRC") to appeal the revocation of his staff privileges. The JRC was comprised of six impartial doctors and the Honorable William Reppy, retired Justice of the California Appeals Court presided over the hearings. Plaintiff admits that he was given adequate time to prepare and present all the witnesses and evidence he desired.

Both sides were represented by counsel at the JRC hearings which began on March 16, 1987. Defendants Dr. Brown, Dr. Jones, and Dr. Schweinfurth all testified before the JRC panel. By the time the hearings concluded on May 14, 1987, the JRC had heard over 70 hours of testimony requiring 12 volumes of transcripts and exhibits. The panel had approximately one week to individually review the transcripts, exhibits, and final written arguments for both sides. The panel reconvened on June 23, 1987 and deliberated from 8 p.m. until a final decision was reached around midnight.

The JRC issued its final report and recommendations on June 30, 1987. The JRC found that the MEC's decision to revoke the Plaintiff's staff privileges "was unreasonable" and reinstated Dr. Austin to the Cottage Hospital medical staff. The JRC's findings, however, were far short of complete vindication for the Plaintiff. The JRC found Dr. Austin's treatment of patient C.P. to be "below the applicable standard" and expressed concern in several other areas.[2]

In reinstating the Plaintiff, the JRC concluded "that the totality of problems reasonably warrants some appropriate condi-

---

**2.** "In the case of patient C.P., the Committee feels that Dr. Austin's failure to ascertain and to respond to the change in the patient's state of consciousness after admission to the Intensive Care Unit and failure to examine the patient resulted in loss of a valuable opportunity to diagnose a possibly reversible post-operative bleeding complication and that in this respect the professional conduct of Dr. Austin was below the applicable standard. * * * In the case of patient P.H., the Committee feels that the failure of Dr. Austin to obtain an adequate biopsy resulted in excess morbidity. * * * In the case of patient C.C., the Committee feels that a

more careful management process, including an evaluation of abnormal laboratory findings, was in order. * * * In the case of patient E.H., there was extensive discussion and concern by the Committee. * * * In the case of patient C.H., the failure of Dr. Austin to obtain informed consent and his failure to document pre-operatively the "promise not to injure" were cause for concern for the Committee." *Report and Recommendation of the Judicial Review Committee of Santa Barbara Cottage Hospital Medical Staff in the Matter of George M. Austin, M.D.* ("JRC Final Report"), at 3.

tions on the continued exercise of clinical privileges by Dr. Austin." JRC Final Report, at 3. Specifically, the JRC recommended to the Board of Directors of Cottage Hospital:

[t]hat the continued exercise of clinical privileges by Dr. Austin be conditioned in two respects:

1) for assurance of proper patient management, that Dr. Austin obtain Internal Medicine, Pathology and Radiological procedural consultations;

2) that there be periodical outside independent neurosurgical case review. The Committee feels that it has been demonstrated that objective monitoring by the neurosurgeons of Cottage Hospital could not be done.

JRC Final Report, at 4. While the Plaintiff attempts to gloss over these conditions on his staff privileges in his papers, there is no question that these are significant restrictions that are out of the ordinary for a surgeon of Plaintiff's experience.

On October 2, 1987, Defendant Dr. McNamara sent the BMQA a revised "Health Facility Reporting Form 805" to reflect Dr. Austin's conditional reinstatement. California law provides a process by which an individual in Dr. Austin's position can appeal the findings of quasi-judicial body, such as the JRC, to the state courts. Cal.Civ.Proc.Code § 1094.5 (West Supp. 1990). Plaintiff has accepted the findings of the JRC and has made no attempt to overturn the restrictions placed on his staff privileges.

## CONCLUSIONS OF LAW

The Court finds no genuine issue of material fact precluding the application of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C.A. §§ 11101 *et seq.*, to this action. As a matter of law, the Court holds that all five of the individual doctor Defendants, as well as Defendant Cottage Hospital, qualify for immunity from federal antitrust liability pursuant to the provisions of the HCQIA. The Court therefore grants the three Defendants' Motions for Summary Judgment because "[u]nder Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### I. *Immunity under the Health Care Quality Improvement Act*

This appears to be a case of first impression in which the Defendants in a federal antitrust action seek summary judgment by asserting immunity under the provisions of the HCQIA. "Neither the Act nor its legislative history indicates at which point in the litigation the court should determine whether the defendants qualify for protection." Note, *Physician Staff Privilege Cases: Antitrust Liability and the Health Care Quality Improvement Act*, 29 W & M L.Rev. 609, 628 (1988) (authored by John Neff). The only commentator so far on the HCQIA suggests that "[t]he most effective point at which to decide [whether there is immunity] is prior to full trial on the antitrust issues," *Id.*, which happens to be the current procedural posture of this action.

In passing the HCQIA in 1986, the United States Congress made the following findings:

(1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

(2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

(3) This nationwide problem can be remedied through effective professional peer review.

(4) The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages

physicians from participating in effective professional peer review.

(5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.

42 U.S.C.A. § 11101.

The "incentive and protection for physicians engaging in effective professional peer review" comes in the form of immunity from damages under federal and state law for qualifying review bodies and individuals associated with, or assisting, the professional review action. 42 U.S.C.A. § 11111(a)(1).[3] The Court must first determine that the professional review action itself complies with the due process requirements outlined in § 11112(a) before the review body and the individuals assisting in the process can be granted the immunity from federal antitrust liability that § 11111(a)(1) promises.

The Court finds that there are two separate professional review actions at issue in this case. The first one being the meeting of Cottage Hospital's Medical Executive Committee on November 19, 1986 ("November 19th MEC Meeting"), where the MEC passed a motion to recommend to Cottage Hospital's Board of Directors that Plaintiff's staff privileges be revoked. The November 19th MEC Meeting is a "professional review action" as defined in § 11151(9).[4] The series of Judicial Review Committee hearings ("JRC Hearings"), that ran from March 16, 1987 through May 14, 1987 and resulted in the conditional reinstatement of Plaintiff's staff privileges constitutes the second "professional review action" as defined in § 11151(9).

## II. *Requirements to Qualify for Immunity Under the HCQIA*

The Defendants can qualify for immunity under the HCQIA if they can demonstrate that:

A) the professional review actions complied with the standards set forth in 42 U.S.C.A. § 11112;

B) the results of the professional review actions were properly reported to the State authorities in compliance with 42 U.S.C.A. §§ 11131(c)(1), 11151(2);

C) the professional review actions occurred on, or after November 14, 1986, the effective date of the HCQIA.

As detailed below, the Defendants have successfully shown that both professional review actions have complied with each of these three requirements.

### A. Standards for Professional Review Actions

#### 1. *Section 11112(a)(1) Analysis*

In order to satisfy the due process requirements as outlined in 42 U.S.C.A. § 11112(a)(1)–(4),[5] the Defendants must

---

**3.** Section 11111 provides in pertinent part: "(a) In general (1) Limitation on damages for professional review actions

If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section—
(A) the professional review body,
(B) any person acting as a member or staff to the body,
(C) any person under a contract or other formal agreement with the body, and
(D) any person who participates with or assists the body with respect to the action,
shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

**4.** Section 11151(9) provides in pertinent part: "The term 'professional review action' means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of a physician. Such a term includes ... professional review activities relating to a professional review action."

**5.** Section 11112(a) provides in pertinent part: "(a) In General
For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—
(1) in the reasonable belief that the action was in the furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,
(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances,

first show that the professional review actions were taken "in the reasonable belief that the action was in the furtherance of quality health care." § 11112(a)(1). The legislative history indicates that this standard was not intended to test "the subjective state of mind of the physicians conducting the professional review." H.R. Rep. No. 903, 99th Cong., 2d Sess. 10, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6384, 6392–93. This "more objective 'reasonable belief' standard ... will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Id.,* at 6393.

With regards to the November 19th MEC Meeting, the Court is satisfied that the MEC voted to revoke the Plaintiff's staff privileges in the interest of furthering quality health care at Cottage Hospital. The Defendant doctors came to believe that the Plaintiff's treatment in various cases was below the acceptable standard of care at Cottage Hospital through their own observations and from concerns voiced by the nursing and technical staffs. This concern for patient safety prompted nearly ten months' worth of both internal and external evaluations and monitoring of the Plaintiff's cases conducted by the Defendant neurosurgeons and other members of Cottage Hospital's Surgical Audit Committee and *Ad Hoc* Committee, as well as the two neurosurgeons appointed by the California Medical Association who had no connection to Cottage Hospital. All of the findings from these numerous evaluations and periods of monitoring were considered before the MEC voted to revoke the Plaintiff's staff privileges.

The Court also finds that the JRC Hearings were conducted "in the reasonable belief that the action was in furtherance of quality health care." § 11112(a)(1). After hearing over 70 hours of testimony at the JRC Hearings that extended from March 16, 1987 to May 14, 1987, the independent panel of five voting (six physicians sat on the panel during the hearings) physicians concluded that "the totality of problems reasonably warrants some appropriate conditions on the continued exercise of clinical privileges by Dr. Austin." JRC Final Report, at 3. The nature of the conditions placed on Plaintiff's reinstatement, that he obtain consultations in internal medicine, pathology, and radiology, and that his cases be periodically monitored by outside independent neurosurgeons, demonstrates that it was the JRC's intent to "restrict incompetent behavior" and "protect patients" through their recommendations.

### 2. *Section 11112(a)(2) Analysis*

The Defendants must next demonstrate that there was a "reasonable effort to obtain the facts of the matter" before the professional review actions were undertaken. § 11112(a)(2). As more fully detailed in the Factual Background section, the November 19th MEC Meeting was the culmination of nearly ten months' worth of evaluations and monitoring of the Plaintiff's work. These reviews were conducted internally by the Defendant neurosurgeons as well as the other physicians on Cottage Hospital's Surgical Audit Committee and *Ad Hoc* Committee.

A comprehensive, external review of the Plaintiff's work was conducted by Dr. Tolchin and Dr. Sheetz, two independent neurosurgeons appointed by the California Medical Association. These outside reviewers spent an entire day at Cottage Hospital reviewing the Plaintiff's charts as well as interviewing officials of the hospital staff and Dr. Austin himself. With regards to the JRC Hearings, Dr. Austin admits that he was allowed adequate time to prepare and was able to present all of the witnesses and evidence he desired to the panel. The Court concludes that both the November 19th MEC Meeting and the JRC Hearings were preceded by very diligent efforts to gather the relevant facts in compliance with Section 11112(a)(2).

(4) in the reasonable belief that the action was warranted by the facts known after such reason-

able effort to obtain facts and after meeting the requirement of paragraph (3)."

### 3. *Section 11112(a)(3) Analysis*

Section 11112(a)(3) requires that the professional review actions comply with the due process requirements of "adequate notice and hearing" in order to merit immunity.[6] The notice procedures outlined in § 11112(b)(1)–(2) contemplate the professional review action being initiated by the health care entity, thereby necessitating adequate notice to the targeted physician. The facts of this case however, are somewhat unique in that Plaintiff requested a second professional review action, the JRC Hearings, to appeal the outcome of an earlier professional review action, the November 19th MEC Meeting.

While the legislative history indicates that "[t]he due process requirement . can always be met by the procedures specified in [§ 11112(b)]," 1986 U.S.Code Cong. & Admin.News, at 6393, both the text of § 11112(b) and the legislative history agree that these procedures need not be followed to the letter in order to satisfy the due process requirement.[7] Taking into consideration the factual twist in this case, the Court concludes that under these circumstances, the closing paragraph of the December 3rd Letter gave Plaintiff sufficient notice of the JRC Hearings.[8]

The Court further finds that the JRC Hearings were conducted in compliance with the procedures outlined in § 11112(b)(3)(A)–(D), thereby satisfying the "adequate hearing" requirement of subsection (a)(3). First off, Plaintiff admits that he was afforded a "fair and impartial hearing." The JRC Hearings were held before a panel of six impartial, independent physicians appointed by the Cottage Hospital, none of whom were in direct economic competition with the Plaintiff. § 11112(b)(3) (A)(iii).

Dr. Austin was represented throughout the hearings by counsel and all of the proceedings were recorded by court reporters and 12 volumes of transcripts were produced. § 11112(b)(3)(C)(i), (ii). Plaintiff admits that he was given the opportunity to call witnesses and to present all of the evidence he desired. § 11112(b)(3)(C)(iii), (iv). Plaintiff submitted a written statement at the close of the hearings on June 15, 1987, and the JRC issued its final report and recommendations along with the underlying reasoning on June 30, 1987. §§ 11112(b)(3)(C)(v), 11112(b)(3)(D)(i).

The Court finds that the initial professional review action, the November 19th MEC Meeting, satisfies the subsection (a)(3) due process requirement by virtue of § 11112(c)(2), which allows "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing ... where the failure to take such an action may result in imminent danger to the health of an individual." The legislative history reveals that "[t]he Committee felt strongly that it was necessary to establish these exceptions ... to allow quick action where it would be reasonable to conclude that someone's health might otherwise suffer." 1986 U.S.Code Cong. & Admin.News, at 6394.

While the Court acknowledges that the JRC eventually found the revocation of Plaintiff's staff privileges to be "unreasonable," it must be noted that the JRC reached this conclusion only after consider-

---

**6.** Section 11112(a)(3) provides that in order for a professional review action to merit immunity, it must be taken: "(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, ..."

**7.** Section 11112(b) provides: "A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of [§ 11112(a)(3)]." The legislative history concurs, noting: "If other procedures are followed, but are not precisely of the character spelled out in [§ 11112(b)], the test of 'adequacy' may still be met under other prevailing law." *1986 U.S. Code Cong. & Admin.News*, at 6393.

**8.** The December 3rd Letter provides in pertinent part: "As requested, a judicial review committee will be appointed by the Chief of Staff and approved by the Executive Committee at its December 16, 1986 meeting. A hearing date will be set and you will be notified as provided in the bylaws." The December 3rd Letter, addressed to the Plaintiff from Dr. Reid, Vice President of the Medical Staff, outlines the reasons for the revocation of the Plaintiff's staff privileges at the November 19th MEC Meeting.

ing over 70 hours of testimony in a series of hearings that lasted two months. The Court is convinced that based on the information available at the time of the special meeting on November 19, 1986, it was reasonable for the MEC to conclude that the health of Dr. Austin's patients "might otherwise suffer" unless immediate action was taken. This conclusion finds support in the fact that the JRC found Dr. Austin's treatment of patient C.P. to be substandard, expressed concerns regarding the treatment of other patients,[9] and placed significant restrictions on Plaintiff's continued exercise of clinical privileges at Cottage Hospital. The Court further finds that the December 3rd Letter and the JRC Hearings satisfy the "subsequent notice and hearing" component of § 11112(c)(2).

### 4. Section 11112(a)(4) Analysis

Lastly, in order to merit immunity, the professional review actions "must be taken ... in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the [due process requirements] ..." § 11112(a)(4). Having already concluded that both professional review actions satisfy the requirements of due process [§ 11112(a)(3)] and reasonable efforts at fact-gathering [§ 11112(a)(2)], the Court finds that both the November 19th MEC Meeting and the JRC Hearings were reasonably warranted based on the facts available at the respective times. The Court comes to this conclusion for the reasons previously discussed in the Section 11112(a)(1) analysis.

### 5. Plaintiff's Inability to Rebut the Presumption of Immunity Created by Section 11112(a)

As outlined above, the Defendants have successfully demonstrated that both pro-

fessional review actions at issue in this case warrant immunity under the HCQIA because both have satisfied the standards set forth in Section 11112(a)(1)–(4). The burden is now on the Plaintiff to rebut this showing, as Section 11112(a) declares that "A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence."

The Plaintiff has failed to even address, much less rebut, the Defendants' evidentiary showing. Despite the fact that all three Defendants seeking summary judgment argue for immunity under the HCQIA in their moving papers, the Plaintiff's consolidated opposition papers make no mention of the statute. The Plaintiff does not attempt to refute or contest any of the Defendants' efforts to apply the immunity provisions of the HCQIA to the facts of this case. The Court finds the Plaintiff's naked allegations of a conspiracy against him, based largely on the Defendant neurosurgeons' refusals to cover for him and unsubstantiated hearsay, insufficient to rebut the presumption of immunity conferred on the professional review actions.

### B. Compliance with the HCQIA's Reporting Requirements

The immunity provided by § 11111(a)(1) can be forfeited if the health care entity fails to report any disciplinary action taken against a physician resulting from a professional review action. § 11111(b).[10] The details of any "professional review action that adversely affects the clinical privileges of a physician for a period of longer than 30 days" must be reported to the Board of Medical Examiners. §§ 11133(a)(1)(A);

**9.** JRC Final Report, at 3, *supra* note 2.

**10.** Section 11111(b) provides: "If the Secretary has reason to believe that a health care entity has failed to report information in accordance with section 11133(a) of this title, the Secretary shall conduct an investigation. If, after providing notice of noncompliance, an opportunity to correct the noncompliance, and an opportunity for a hearing, the Secretary determines that a health care entity has failed substantially to

report information in accordance with section 11133(a) of this title, the Secretary shall publish the name of the entity in the Federal Register. The protections of subsection (a)(1) of this section shall not apply to an entity the name of which is published in the Federal Register under the previous sentence with respect to professional review actions of the entity commenced during the 3–year period beginning 30 days after the date of publication of the name."

11133(a)(3)(A)–(C) (detailing the information required); 11134(a) (outlining the proper timing and form of reporting).

Plaintiff's clinical privileges at Cottage Hospital were "adversely" affected following both of the professional review actions at issue. In the context of the HCQIA's reporting requirements, the term "adversely affecting" is defined to include both the revocation and restriction of a physician's clinical privileges. § 11151(1). The November 19th MEC Meeting resulted in the revocation of the Plaintiff's clinical privileges and although they were reinstated as a result of the JRC Hearings, the panel concluded "that the totality of problems reasonably warrants some appropriate conditions on the continued exercise of clinical privileges by Dr. Austin." JRC Final Report, at 3. These conditions, mandatory consultations and periodic monitoring, are a definite restriction on Dr. Austin's privileges.

The Defendants have sufficiently shown, and Plaintiff admits, that the HCQIA's reporting requirements have been satisfied. On January 13, 1987, Defendant Cottage Hospital sent a "Health Facility Reporting Form 805" to the California Board of Medical Quality Assurance ("BMQA") containing Dr. Austin's name, a description of the reasons for the revocation of his privileges as of the November 19th MEC Meeting, and other appropriate information. Following Dr. Austin's conditional reinstatement as a result of the JRC Hearings, Defendant Cottage Hospital sent an amended "805 Form" to the BMQA on October 2, 1987. The contents of the "805 Form" satisfy the requirements of § 11133(a)(3) and the BMQA is the appropriate state authority.[11]

## C. Occurrence of the Professional Review Actions After the Effective Date of the HCQIA

The Court finds that both professional review actions occurred after November 14, 1986, the effective date of the HCQIA. The immunity provided under § 11111(a) "shall apply to professional review actions commenced on or after the date of the enactment of this Act [November 14, 1986]." The Health Care Quality Improvement Act of 1986, Pub.L. No. 99–660, § 416, 42 U.S.C.A. §§ 11101 *et seq.* (West Supp.1989). The first professional review action occurred on November 19, 1986 at the special meeting of the Cottage Hospital Medical Executive Committee, and the second review action, the JRC Hearings, commenced on March 16, 1987 with the final report issuing on June 30, 1987.

## III. *Conclusion*

With the satisfaction of the final requirement above, the Court concludes that both professional review actions merit immunity from federal antitrust liability pursuant to § 11111(a)(1). This immunity extends to the five Defendant physicians because "any person who participates with, or assists the body with respect to the [professional review] action" is also shielded from federal antitrust liability by § 11111(a)(1)(D). Defendant Cottage Hospital, and its various committees involved in the review process—the Surgical Audit Committee, the *Ad Hoc* Committee, the Medical Executive Committee, and the Judicial Review Committee—all fall within the § 11151(11) definition[12] of a "professional

---

**11.** Section 11133(a)(3) provides in pertinent part:

"(3) Information to be reported
The information to be reported under this subsection is—
(A) the name of the physician or practitioner involved,
(B) a description of the acts or omissions or other reasons for the action or, if known, for the surrender, and
(C) such other information respecting the circumstances of the action or surrender as the Secretary deems appropriate."

The term "Board of Medical Examiners" is defined in § 11151(2) to include "a Board as determined by the State with responsibility for the licensing of physicians...." The Board so designated by the State of California is the Board of Medical Quality Assurance.

**12.** Section 11151(11) provides: "The term 'professional review body' means a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assist-

review body" that is entitled to immunity under § 11111(a)(1)(A).

Accordingly, IT IS HEREBY ORDERED that the Summary Judgment Motions of Defendants Santa Barbara Cottage Hospital, Thomas Jones, M.D., and James R. Saint John, M.D. be GRANTED. Since all of the Defendants are immune from federal antitrust liability by virtue of § 11111(a) of the Health Care Quality Improvement Act of 1986, only the pendent state tort claims for Intentional Interference with Prospective Business Advantage and Conspiracy remain as viable causes of action.

IT IS FURTHER ORDERED that these pendent state claims are DISMISSED WITH PREJUDICE for lack of subject matter jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

ing the governing body in a professional review