**John Phillip SMITH, M.D., Plaintiff,**

v.

**William B. RICKS, M.D.,
et al., Defendants.**

**No. C 91–20368 JW.**

United States District Court,
N.D. California.

July 15, 1992.

Jerome Berg, San Francisco, Cal., for plaintiff.

Chris G. Gasparich, Mary C. Oppedahl, Jennifer A. Shy, Jeffrey L. Fazio, Crosby, Heafey, Roach & May, Oakland, Cal., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WARE, District Judge.

Plaintiff John Smith brings this action alleging violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and Section 6 of the Clayton Act, 15 U.S.C. § 17. Plaintiff's claims arise out of an alleged conspiracy and collusive effort by the Defendants to diminish Plaintiff's surgical practice by revoking his staff privileges at Good Samaritan Hospital of the Santa Clara Valley.

Plaintiff has named numerous defendants in his complaint, including a number of physicians "involved in the operation of the medical staff activities" at Good Samaritan; Good Samaritan Hospital and Health Dimensions, Inc., which controls Good Samaritan; a majority of the board of trustees of Good Samaritan, which voted to revoke Plaintiff's staff privileges; and two legal advisors of the above described Defendants. Pl.['s] Compl. For Damages. Defendants filed this motion for summary judgment, pursuant to Fed.R.Civ.P. 56. Defendants assert that under the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq., they are immune from federal antitrust liability.

## I. BACKGROUND

Plaintiff first applied for staff privileges at The Good Samaritan Hospital of the Santa Clara Valley in November, 1981. Plaintiff became an Associate member of the medical staff in February, 1982. In March, 1983, Plaintiff's status was upgraded from Associate to Active.

Pursuant to California regulations, staff privileges must be reviewed biennially. In August, 1984, Plaintiff applied for renewal of his privileges, and in January, 1985, he was reappointed to the Hospital's medical staff. In the reapplication form, Plaintiff stated that he was appealing a decision regarding his status at another hospital, O'Connor Hospital ("O'Connor").

On January 6, 1986, the California Board of Medical Quality Assurance ("BMQA") informed Good Samaritan Hospital that Plaintiff's staff privileges at O'Connor Hospital had been revoked. The loss of privileges was based on Plaintiff's medical treatment of five patients at O'Connor Hospital. When Defendant Ullrich, then Chairman of the Department of Medicine at Good Samaritan, inquired into the details of the O'Connor decision, Plaintiff stated that the patient care claims were unfounded, were reviewed by a biased committee, and that his termination was based on a "failure to advance." Good Samaritan asked O'Connor to provide medical records for the five O'Connor patient cases which prompted Plaintiff's loss of privileges at O'Connor. Plaintiff objected to release of the documents and to an investigation by the Good Samaritan staff. Ultimately Plaintiff consented to the release of the files, and the files were received by Good Samaritan in late December, 1987.

In September, 1986, Plaintiff was once again required to submit to a biennial review of his staff privileges at Good Samaritan, as required by State regulation. The 1986 reapplication, which occurred during the investigation of Plaintiff's termination from O'Connor Hospital, was ultimately denied by Good Samaritan Hospital.

In early 1988, Defendants Ricks, Murphy, Siegel and Ullrich, who are cardiologists at Good Samaritan, reviewed the O'Connor case files and concluded that Plaintiff's treatment of those patients had been below acceptable standards of care. All five of these cases had involved the cardiac catheterization of patients.

On April 14, 1988, Good Samaritan's Cardiology Executive Committee met with Plaintiff and discussed the five O'Connor cases. Unbeknownst to the Committee, six days prior to this meeting, a patient of Plaintiff's died during a cardiac catheterization procedure. On June 9, 1988, the Committee reviewed the case file of this latest patient death, and on June 21, 1988, discussed the matter with Plaintiff. The Committee ultimately concluded that Plaintiff's privileges should be revoked. Good Samaritan's Department of Medicine Executive Committee concurred.

On July 14, 1988, the Hospital's Medical Staff Executive Committee ("MEC") received the above recommendations. Plaintiff met with the MEC on August 19, 1988. The MEC interviewed Plaintiff regarding each incident which preceded the recommendation to revoke his privileges. On August 29, 1988, the MEC notified Plaintiff it had adopted the recommendation to revoke Plaintiff's staff privileges. The MEC did indicate, however, that Plaintiff could reapply for staff privileges provided he agree to a number of conditions, including training and consultation requirements, as well as a reduced work load. The MEC and Plaintiff were unable to reach a mutual agreement on acceptable conditions for Plaintiff's reapplication. Accordingly, the MEC put forth a recommendation to revoke Plaintiff's staff privileges "based on [Plaintiff's] inability to interpret, organize and analyze medical information and use it as a basis for making medical judgments." Def.['s] Supplemental Statement of Undisputed Facts RE Def.['s] Mot. for Summ. J.

Thereafter, Plaintiff sought review of the MEC's decision by the Hospital's Judicial Review Committee ("JRC"). Plaintiff received notice of the JRC hearing, which included nine individually held sessions. Each session was transcribed by a court reporter, resulting in over 1,500 pages of transcription. The hearings were held be-

fore a hearing officer and a panel of physicians who were not in economic competition with Plaintiff. The sessions were held between April 17, 1989 and August 29, 1989. Plaintiff was represented by counsel at the sessions, and was permitted to call, examine and cross-examine witnesses. A total of six witnesses were called during the course of the hearings.

Plaintiff introduced 22 exhibits into evidence at the JRC hearing, and was presented with all evidence introduced by the medical staff. Plaintiff claims that he was denied the opportunity to have a comparison survey of Defendant "physician-competitors" medical services rendered at Good Samaritan. Pl.['s] Compl. for Damages. Plaintiff argues the survey would have shown that his own work was as good, if not superior to, the work of the doctors reviewing Plaintiff's cases. Plaintiff claims the survey would show that the decision to revoke his privileges was both arbitrary and the product of an effort to eliminate Plaintiff as an economic competitor in the field of cardiac care.

On October 2, 1989, the JRC decided that the charges against Plaintiff were supported by facts and evidence. The JRC confirmed that Plaintiff's treatment of the five O'Connor patients was below an acceptable standard of care; that the records of Plaintiff's patients revealed a lack of logic, organization and judgment; and that the patient death in April, 1988 resulted from similar treatment as that exhibited by Plaintiff in the O'Connor cases. However, the JRC decided to reappoint Plaintiff to the medical staff with significant preceptorship requirements. Plaintiff accepted this decision and filed no appeal.

On October 16, 1989, the Medical Staff appealed the JRC decision to the Hospital's Board of Trustees. The Medical Staff argued that the preceptorship was not sufficient to ensure patient welfare. Plaintiff was notified of the Board's hearing and submitted a written statement. Plaintiff, represented by counsel, attended the two hearings held by the Board. The hearings were transcribed. Plaintiff's counsel conducted a voir dire of the Board. The Board accepted the JRC's findings of fact and accepted no new evidence from either party. On January 20, 1990, the Board reversed the decision of the JRC, and ordered the termination of Plaintiff's staff privileges. The Board found that preceptorship was not adequate protection of patient welfare, given the nature of the cardiac procedures Plaintiff would be performing, and the history of Plaintiff's medical performance.

Plaintiff's antitrust allegations extend beyond the events at Good Samaritan Hospital described above. Plaintiff had also maintained staff privileges at Mission Oaks Hospital in the Santa Clara Valley. In 1989, Health Dimensions, Inc., the operator of Good Samaritan, acquired Mission Oaks Hospital, and merged the two institutions into a single hospital called Good Samaritan. The medical staffs of the two hospitals were merged, and the staff of Mission Oaks was dissolved. Staff members of the former Mission Oaks Hospital who did not have privileges at Good Samaritan were invited to apply; Plaintiff chose not to do so.

The substance of Plaintiff's complaint can be described as a conspiracy theory encompassing most of the individuals who participated in the various reviews and appeals described at length above. Plaintiff alleges that the defendant cardiologists "covered" for each other by not conducting reviews of each other's work through an audit procedure. Plaintiff further alleges a number of due process violations during the review process, including: 1) that a legal advisor used by the committees was a family relative of one of Plaintiff's accusers; 2) that the Hospital by-laws imposed the burden of proof on Plaintiff to show that the decision to expel Plaintiff lacked a basis in fact or was otherwise arbitrary; 3) that Plaintiff was denied the opportunity to present a comparative survey of medical performance by all physicians in the cardiology department; 4) that Plaintiff was not permitted to present evidence of other cardiologists' cases at Good Samaritan; 5) that Plaintiff's counsel was not permitted to cross-examine adverse witnesses or otherwise actively participate in the hearing process; and 6) that Plaintiff's counsel was not permitted through voir dire to expose bias in review committee members.

It is Plaintiff's contention that the above alleged conduct, as well as the acquisition of the Mission Oaks Hospital, is evidence of a conspiracy to restrain competition in and to monopolize the practice of internal medicine within the relevant market of Santa Clara County.

## II. DISCUSSION

### 1. *Legal Standard*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "[T]he inquiry focuses on whether the nonmoving party has come forward with sufficiently 'specific' facts from which to draw reasonable inferences about other material facts that are necessary elements of the nonmoving party's claim." *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n.*, 809 F.2d 626 (9th Cir.1987).

At the summary judgment stage, the resisting party must proffer more than broadly sweeping allegations in order to establish a genuine issue of material fact. Plaintiff's submissions to this Court suffer from an excess of allegations, and a glaring absence of any detailed explanations. It is not sufficient to claim that due process has been violated; a party must state exactly how and when and by whom due process was violated. This burden requires a degree of specificity that Plaintiff's submissions clearly lack. The Court finds no genuine issue as to any material fact in this case, thus making summary judgment proper. The Court finds that the Health Care Quality Improvement Act of 1986 confers immunity on the Defendants as to federal antitrust liability, and accordingly the motion for summary judgment is GRANTED.

### 2. *Health Care Quality Improvement Act of 1986*

In 1986, Congress passed the Health Care Quality Improvement Act ("the Act"), making the following findings:

(1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

(2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

(3) This nationwide problem can be remedied through effective professional peer review.

**(4) The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective peer review.**

**(5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.**

42 U.S.C. § 11101 (West 1991) (emphasis added).

The Act provides immunity from damages under any federal or state law, provided that the requirements of the Act are satisfied. *Id.* at § 11111. Immunity is available to professional review bodies; to members and staff of these bodies; to persons under contract or other agreement with these bodies; and to persons participating with or assisting these bodies. *Id.* In order for Defendants to receive immunity, this Court must make three findings: (1) that the peer review process conducted by Defendants satisfies the due process requirements articulated in the Act; (2) that the results of the review were reported to State authorities; (3) and that the review actions occurred on, or after November 14, 1986, the effective date of the Act. *Austin v. McNamara*, 731 F.Supp. 934, 939 (C.D.Cal.1990).

#### a. *Standards for Professional Review Actions*

Section 11112 of the Act sets out the standards for review which are required

for immunity from antitrust liability. Section 11112(a) requires that the review actions be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

**A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.**

*Id.* at § 11112(a) (emphasis added).

#### i. *The Action Was in Furtherance of Quality Health Care*

In order to prove that the review actions conducted by Defendants were taken in the reasonable belief that they were in furtherance of quality health care, Defendants must show that "with the information available to them at the time of the professional review action, [Defendants] would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Austin* at 940.

The review process which is the subject of this suit was commenced after the BMQA notified Good Samaritan Hospital staff that Plaintiff's staff privileges had been revoked at another hospital due to the inadequate care Plaintiff had provided in five specific cases. The review of these five O'Connor cases commenced in early 1988. The Good Samaritan Board of Trustees' final decision to revoke Plaintiff's staff privileges, culminating months and years of investigations and hearings, was not issued until January 20, 1990.

Although the JRC did not recommend to revoke Plaintiff's privileges, the JRC did find that Plaintiff's treatment of the five O'Connor cases was below acceptable standards of care, and that Plaintiff exhibited deficiencies sufficient to warrant a significantly conditioned reappointment to the medical staff. This Court finds that there is no evidence, beyond the unsubstantiated allegations of Plaintiff, that the review was conducted without the reasonable belief that the action was in furtherance of quality health care.

#### ii. *The Action Was Conducted After a Reasonable Effort to Obtain the Facts of the Matter*

Defendants must next demonstrate that the review action was taken after a reasonable effort to obtain the facts of the matter. 42 U.S.C. § 11112(a)(2) (West 1991). Defendants obtained the five O'Connor case files and conducted a separate investigation into the quality of Plaintiff's care. Plaintiff alleges that the O'Connor Hospital findings were the result of unfounded claims and a biased review process. Despite his asserted belief that the case files did not reveal deficiencies in the quality of his care, Plaintiff objected strongly to a review of the O'Connor cases by the Good Samaritan staff. Ultimately Plaintiff dropped his objections and the files were reviewed by the Good Samaritan staff.

In addition to the review of the O'Connor cases, the medical staff and Plaintiff both participated in further investigation into Plaintiff's professional performance at Good Samaritan. This Court finds that the review action conducted by Good Samaritan Hospital was made after a reasonable effort to obtain the facts of the matter. Although Plaintiff attacks the review process because he was not permitted to introduce evidence of the performance of other physicians, the Act's requirements do not suggest that a peer review must focus on the conduct of any physician other than the one being reviewed.

#### iii. *Adequate Notice and Hearing Procedures Were Afforded to Plaintiff*

Section 11112(a)(3) of the Act requires that the Defendants provide adequate notice and hearing procedures, or other fair

procedures. *Id.* at § 11112(a)(3). The Act, in § 11112(b), specifies procedures to be used by peer review bodies; however, the section concludes by stating, "[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section." *Id.* at § 11112(b). The legislative history of the Act confirms that the specifications within the Act need not be followed verbatim, and that the ultimate inquiry is if the procedures utilized were "adequate". 1986 U.S.Code Cong. & Admin.News, 6287 at 6393.

There is no indication that Plaintiff did not receive adequate notice of the professional review action and of the hearings conducted; thus, § 11112(b)(1) and (2), which require proper notice of both review actions and any hearings which are to be held, were satisfied.

Section 11112(b)(3) deals with the conduct of hearings. Plaintiff's JRC hearing was held before a panel of physicians who were not in economic competition with Plaintiff, thereby satisfying § 11112(b)(3)(A). Section 11112(b)(3)(C) specifies a number of rights which must be afforded to the physician under review.

There is evidence that the first four of the five rights were afforded Plaintiff because: 1) Plaintiff was represented by an attorney of his choice; 2) a record of the proceedings was made; 3) Plaintiff called, examined and cross-examined witnesses at the hearing; and 4) Plaintiff presented evidence which had been determined relevant by the hearing officer, regardless of its admissibility in a court of law. The fifth right which must be afforded Plaintiff is the right to submit a written statement at the conclusion of the hearing. There is no evidence that such a statement was submitted, nor is there evidence that Plaintiff was prevented from doing so. Accordingly, this Court finds that Defendants satisfied the requirements of § 11112(b)(3)(C).

Finally, § 11112(b)(3)(D) requires that at the end of the hearing process, Plaintiff has the right to a written recommendation from the panel including the basis for the panels recommendations. The JRC gave Plaintiff a written recommendation, which included its basis for the recommendation. Accordingly, the last requirement is also satisfied.

iv. *Defendants Had a Reasonable Belief that the Action was Warranted by the Facts Known After a Reasonable Effort to Obtain Facts and After Meeting Due Process Requirements*

The final requirement for immunity to be conferred on Defendants is that the review action of Plaintiff was "taken in the reasonable belief that the action was warranted by the facts known after such reasonable efforts to obtain facts and after meeting the [due process requirements]." *Id.* at § 11112(a)(4). The Court finds, having already concluded that the review action conducted by Defendants satisfied the standards of § 11112(a)(2) and (3), that based on the facts presented to Defendants and the procedures utilized by Defendants, revoking Plaintiff's staff privileges was warranted. This finding of the Court is premised on the analysis set out above.

v. *Plaintiff Has Not Overcome the Presumption that Defendants Met the Standards of § 11112(a)*

The evidence presented by Defendants demonstrates that Good Samaritan's review action warrants the protection afforded by the Act. Defendants have shown that they satisfied the standards specified in § 11112(a). "A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11112(a) of this title unless the presumption is rebutted by a preponderance of the evidence." *Id.* at § 11112(a).

The Court finds, in reviewing Plaintiff's submissions, that Plaintiff's broadly based allegations of conspiracy and flagrant violations of due process rights are largely unsubstantiated. Plaintiff makes claims as to the current state of the law, the technical competence of other physicians at Good Samaritan Hospital, and broad accusations of the Good Samaritan review proceedings being akin to a "kangaroo court." Pl.['s] Mem. of Law in Opp'n to Mot. for Summ. J. What Plaintiff fails to do, however, is explain in detail how and when any of these

**612**

allegations truly occurred, and why they are relevant to the question of whether the Defendants' review action warrants immunity. The Court is not required to conduct discovery for the Plaintiff in order to take the unsubstantiated allegations within Plaintiff's papers and match them up with facts that tend to support these theories and claims.

The Court finds, based upon the undisputed facts in this case, and upon the evidence advanced by Plaintiff, that Plaintiff has not and cannot rebut the Act's presumption of immunity by a preponderance of the evidence.

b. *Defendants complied with the Act's Reporting Requirements*

■ "The immunity provided by § 11111(a)(1) can be forfeited if the health care entity fails to report any disciplinary action taken against a physician resulting from a professional review action. § 11111(b). The details of any 'professional review action that adversely affects the clinical privileges of a physician for a period of longer than 30 days' must be reported to the Board of Medical Examiners. §§ 11133(a)(1)(A); 11133(a)(3)(A)–(C)." *Austin* at 942. The Act defines "adversely affects" to include the revocation of staff privileges. 42 U.S.C. § 11151.

Defendants have presented copies of the appropriate Form 805, which was sent to the BMQA and which outlined the background and resolution of Plaintiff's case. The Act requires that the report to the agency include the following: the physician's name; a description of the reasons for the action taken; and other appropriate information. *Id.* at § 11133. This Court finds that the contents of the form comport with the requirements of § 11133, and the BMQA is the appropriate agency.

c. The Professional Review Action(s) Occurred After the Effective Date of the Act

The Act became effective on November 14, 1986, and the Court finds that the professional review action(s) which precipitated this lawsuit occurred after that date. The Act requires that a review action occur after November 14, 1986 in order to qualify for immunity from liability. The Court's finding is premised on the chronology of events presented above.

## III. CONCLUSION

The Defendants have satisfied each requirement of the Act, and accordingly, the Court finds that the professional review action conducted by Defendants warrants immunity from federal antitrust liability. The Court finds, in consideration of the Act's broad grant of immunity within § 11111, that immunity should be conferred on all named Defendants in the present action.

Accordingly, because all of the named Defendants are immune from federal antitrust liability by virtue of the Health Care Quality Improvement Act of 1986, Defendants' motion for summary judgment is hereby GRANTED.

IT IS SO ORDERED.