**Denard FOBBS, M.D., Plaintiff,**

v.

**HOLY CROSS HEALTH SYSTEM CORP. dba Saint Agnes Hospital and Medical Center, Cynthia Bergmann, M.D., James Cahill, M.D., Jay Christensen, M.D., Charles Gavin, M.D., Seung Nam Kim, M.D., Robert Meltvedt, M.D., Marshall Noel, M.D., Morton Rosenstein, M.D., Roydon Steinke, M.D., Robert Wilson, M.D., and Larry E. Nix, M.D., Defendants.**

**No. CV–F–89–682–REC.**

United States District Court, E.D. California.

March 16, 1992.

Jacob M. Weisberg, Fresno, Cal., Boyd S. Lemon, Hirschtick Chenen Lemon Cohen and Linden, Marina Del Rey, Cal., James Francis Tritt, Fresno, Cal., for Fobbs.

Mario Louis Beltramo, Jr., McCormick Barstow Sheppard Wayte and Carruth, Fresno, Cal., for Holy Cross and St. Agnes.

J. Robert Liset, Musick Peeler and Garrett, Los Angeles, Cal., for defendants/doctors.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COYLE, Chief Judge.

On October 15, 1991, the court heard defendants' motion for partial summary judgment. Upon due consideration of the written and oral arguments of the parties, the court now enters its order granting the motion as set forth herein.

In this motion physician-defendants seek summary judgment of plaintiff's Sherman Act claim. Corporation-defendants have joined in physician-defendants' motion for summary judgment. Physician-defendants and corporation-defendants are collectively referred to as "defendants."

### I. *Background*

Plaintiff is a physician licensed to practice medicine in the States of California and Texas. He has conducted an obstetrics and gynecology (hereinafter "ob/gyn") practice in Fresno since 1982. All physician-defendants are also licensed to practice medicine

in the State of California, and conduct ob/gyn practices in Fresno County.

Defendant St. Agnes Medical Center, a not-for-profit corporation, is a wholly-owned subsidiary of defendant Holy Cross Health System Corp., also a not-for-profit corporation. St. Agnes is an ob/gyn facility in Fresno County. At one point or another, all physician-defendants were members of various staff committees at St. Agnes.[1]

Plaintiff became a member of the Department of Obstetrics–Gynecology/Perinatology at St. Agnes in 1982. In 1987, St. Agnes granted plaintiff temporary privileges to perform intra-abdominal laser surgery.[2] After plaintiff had performed a few intra-abdominal laser surgeries, defendants state that "concerns were raised as to possible irregularities with respect to Plaintiff's handling of these cases." Consequently, the Ob–Gyn/Perinatology Supervisory Committee (hereinafter "Supervisory Committee") invited plaintiff to discuss three specific cases on March 30, 1987. As a result of this meeting, copies of the three cases were sent to Dr. Ostergard for review. Dr. Ostergard is a professor and a former mentor of plaintiff's.

Dr. Ostergard's report is interpreted differently by plaintiff and defendants. Defendants assert that Dr. Ostergard was critical of plaintiff's management of the cases which were submitted for his review, while plaintiff asserts that Dr. Ostergard was primarily critical of the hospital. Both assertions are true to an extent.

St. Agnes' Tissue and Blood Usage Committee (hereinafter "TBU Committee") reviews all surgical cases in which a specimen is removed. On March 14, 1987, the TBU Committee referred a case of plaintiff's to the Supervisory Committee. The members of the Supervisory Committee arranged for plaintiff to discuss this case with them on May 26, 1987.

The Supervisory Committee determined that plaintiff had improperly managed this case and the aforementioned three cases, and made a recommendation to the Medical Executive Committee (hereinafter "MEC") that plaintiff be made subject to a monitoring system.

On June 23, 1987, based upon the Supervisory Committee's review of these four cases and its recommendation that a monitoring system be established, the MEC imposed monitoring and consultation restraints on patients admitted to St. Agnes by plaintiff. Restraints consisted of the following:

1. Plaintiff was to have a second opinion on every admission to Saint Agnes Medical Center;

2. This was to include a history and physical examination by the monitor;

3. On any surgical procedure, the monitor was to be present during the operation;

4. The follow-up care of the patient was to be shared with the monitor;

5. The monitors were to be members of the Ob–Gyn/Perinatology Supervisory Committee.

On July 14, 1987, plaintiff met informally with the MEC to discuss the monitoring restraints. The MEC decided to continue the monitoring system and directed the Supervisory Committee to conduct a further review of plaintiff's cases.

Members of the Supervisory Committee conducted a random review of plaintiff's cases and determined that four more had been improperly managed. These cases, plus the previous four, were included in a formal notice of charges to be reviewed by St. Agnes' Judicial Review Committee (hereinafter "JRC").

The JRC conducted a review of the eight cases at a hearing on September 15 and 24, 1987. On October 20, 1987, the JRC affirmed the MEC's decision to continue mon-

---

1. Drs. Cahill, Christensen, Gavin, Kim, Meltvedt, Noel, Rosenstein, Wilson and Nix were all members of St. Agnes' Ob–Gyn/Perinatology Supervisory Committee. Drs. Bergmann and Steinke were members of the hospital's Judicial Review Committee.

2. Defendants' assert that plaintiff's privileges were granted on a case-by-case basis. Plaintiff disputes this assertion.

itoring plaintiff. Plaintiff subsequently appealed this decision to the Appeal Board of the Board of Trustees (hereinafter "Appeal Board"). The Appeal Board ordered the JRC to reopen the hearing in order to consider additional evidence to be provided by plaintiff which the JRC had not previously had before it. The Appeal Board also provided that the parties would be represented by counsel at the reopened hearing.

On February 22, 1988, the JRC affirmed the MEC's decision to impose a monitoring system on plaintiff, with modifications. The JRC defined the circumstances which would require a "mandatory consult," and limited the duration of the monitoring restrictions to November 20, 1988, at which time the MEC was to review plaintiff's progress and make recommendations as to the continued viability of his privileges at St. Agnes.

On February 24, 1988, plaintiff appealed this decision of the JRC to the Appeal Board. On April 19, 1988, the Appeal Board received argument from counsel for both plaintiff and the MEC. Plaintiff's counsel argued, and the MEC agreed, that plaintiff had wrongly been denied the right to conduct voir dire of the JRC members at the previous hearings.[3] As a result, the Appeal Board made the following recommendations:

1. that the matter be remanded to a newly constituted JRC with new members for further review and decision;

2. that the parties have the right to engage in voir dire examination of the members of the newly formed JRC;

3. that the requirements of monitoring upon plaintiff be continued until further decision of the JRC; and

4. that the JRC promptly conduct its review and make its recommendation to the Board of Trustees of St. Agnes Medical Center and report the decision within thirty days from the date of remand.

St. Agnes' Board of Trustees approved the Appeal Board's recommendation.

The JRC decided to allow both parties to be represented by counsel at the remand hearing.

The remand hearing was originally set for May 9, 1988, however, due to conflicts in both parties' schedules, it was postponed to June 13 and 14, 1988. The JRC set voir dire for June 10, 1988. The hearing was then again postponed, to August 1 and 2, 1988, with voir dire on July 28, 1988, in order to accommodate the schedule of plaintiff's new counsel.

On July 15, 1988, plaintiff informed the JRC that he would not participate in the remand hearing or any other proceedings. Plaintiff states that he "desired that the administrative hearing proceed to its conclusion so that he could seek review in the court, and [he] determined that further participation would be futile in view of the erroneous and unfair hearing standards."[4] Plaintiff further states that "[a]lthough [he] did not physically appear, [he] did not waive his right to a hearing and desired that the hearing proceed to conclusion, to permit subsequent judicial review."

---

**3.** Plaintiff alleges the following concerning the original composition of the JRC,

> The panel of judges consisted of direct competitors of the Plaintiff (Drs. Steinke, Bergman, and Duprey); of one person who had exhibited personal animosity toward the Plaintiff, who had treated one of the patients involved, and who was in the process of entering into a partnership with 2 of Plaintiff's accusers on the OB/GYN/Perinatology Supervisory Committee, such accusers having made no secret of his dislike of the Plaintiff (Dr. Bergman, who was married to Dr. Noel); and of other persons who received referrals from Plaintiff's accusers on the OB/GYN/Perinatology Supervisory Commit-

tee (Drs. Lattin, Schwartz, Tasto, and Weinberg).

Plaintiff also asserts that the JRC wrongly considered the additional group of four cases as they did not form part of the basis upon which the original monitoring restrictions were imposed.

**4.** As with the original composition of the JRC, plaintiff felt the remand JRC was biased against him, alleging that two members were direct competitors of his, that one received referrals from one of plaintiff's "accusers," that the hearing officer told him that he would not allow plaintiff to "voir dire him," and that no member was versed in laser surgery.

The JRC met on August 1, 1988, to determine whether plaintiff had good cause for his decision to withdraw from further proceedings. At the onset of the hearing, the hearing officer conducted a pseudo-voir dire of the new JRC members. Each member indicated that he or she could fairly and impartially consider the matter before him or her.

The JRC then decided that plaintiff did not have good cause for failing to attend the hearing and deemed him to have voluntarily accepted the monitoring restraints.

On August 10, 1988, plaintiff performed a Cesarean Section without obtaining a consultation as required by the monitoring system. On August 26, 1988, plaintiff met with the MEC regarding his compliance with the monitoring system. At this meeting plaintiff indicated that he had not complied with the system in connection with the patient upon whom he had performed the Cesarean, and that he did not plan to comply in the future.[5] At this juncture, plaintiff's medical staff membership at St. Agnes was suspended. Defendants assert that this suspension was a final decision, however, plaintiff contends that it was not.

On August 29, 1988, plaintiff received notice of his suspension and his right to appeal. Thereafter, plaintiff informed the MEC that he would not participate in an appeal or hearing unless:

1. the earlier imposed monitoring was curtailed; and
2. the hearing was fair, meaning
 a. the hearing officer is unbiased and has no pecuniary interest in the matter;
 b. all members of the hearing panel are not in competition with plaintiff and are from outside of the Fresno/Modesto area; and
 c. at least one member of the hearing panel has knowledge and experience in laser abdominal surgery.

The MEC considered plaintiff's letter ambiguous regarding his decision to appeal

his suspension and allowed him 15 more days to request a hearing. In a letter dated September 29, 1988, plaintiff declined to request a hearing.

Meanwhile, on September 8, 1988, plaintiff filed a complaint with the Office of Civil Rights of the United States Department of Health and Human Services (hereinafter "OCR") against St. Agnes. The complaint alleged race discrimination.

In August of 1989, after conducting a detailed investigation which entailed review of patient charts and transcripts of the hearings held in the hospital's administrative process, the OCR and St. Agnes entered into a Voluntary Settlement Agreement. This agreement provided for the restoration of plaintiff's staff privileges with a system of monitoring restraints similar to those previously imposed. Plaintiff was afforded 30 days to decide whether to seek reinstatement pursuant to the terms of the agreement. The agreement also stated that should plaintiff refuse to accept the restrictions on his privileges, neither St. Agnes and OCR would have any further obligation to verify his compliance with the terms of the agreement.

Plaintiff refused to accept the terms of the agreement.

On September 29, 1989, plaintiff filed this action against defendants. Defendants moved to dismiss. The parties stipulated to dismissal in February of 1990. Plaintiff then filed a First Amended Complaint on May 7, 1990, alleging claims under (1) the Sherman Act; (2) the Cartwright Act; (3) 42 U.S.C. § 1981; (4) Title VI of the Civil Rights Act; and (5) 42 U.S.C. § 1985(3). Physician-defendants moved to dismiss plaintiff's Second and Fifth claims for relief. Defendant–St. Agnes joined the motion and also moved to dismiss plaintiff's Fourth claim for relief. On May 11, 1990, the court dismissed all three causes of action and granted plaintiff leave to amend his Fourth and Fifth claims.

---

**5.** In his Statement of Genuinely Disputed Material Facts, plaintiff states that he had never complied with the monitoring restrictions and that defendants' acquiescence to such noncom-
pliance indicates that they "did not consider the restrictions in good faith to protect the health of patients."

Plaintiff filed his Second Amended Complaint on June 20, 1990, alleging causes of action for (1) the Sherman Act; (2) 42 U.S.C. § 1981; (3) Title VI; and (4) 42 U.S.C. § 1985(3). Physician-defendants moved to dismiss the Fourth claim. Defendant–St. Agnes joined this motion and also moved to dismiss plaintiff's Third cause of action. On August 30, 1990, the court dismissed plaintiff's Third and Fourth claims.

Defendants subsequently moved for partial summary judgment as to plaintiff's Second cause of action and on November 28, 1990, the court granted this motion. In this motion defendants seek summary judgment as to plaintiff's only remaining cause of action, his Sherman Act claim [6]. Defendants make this motion on the basis that, pursuant to the federal Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152 (hereinafter the "HCQIA" or the "Act"), they are entitled to qualified immunity from plaintiff's Sherman Act claim.

This court has jurisdiction under 28 U.S.C. § 1337.[7]

## II. *Summary Judgment Standard*

Summary judgment is properly granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FRCP 56.[8]

---

**6.** Specifically, this cause of action alleges that in furtherance of a conspiracy and with the intent of competitively harming plaintiff, defendants committed the following acts (plaintiff refers to St. Agnes and Holy Cross collectively as "Saint Agnes Medical Center"),

A. Attempted to curtail or eliminate Plaintiff's surgical privileges at Defendant SAINT AGNES MEDICAL CENTER, and ... did cause Plaintiff FOBBS' surgical privileges ... to be suspended;

B. Attempted to cause the California State Board of Medical Quality Assurance to take disciplinary action against Plaintiff FOBBS. They did succeed in causing the State Board ... to report restrictions of privileges to numerous medical facilities and medical insurance carriers and the Texas State Board of Medical Examiners resulting in damaging effects on Plaintiff's practice and professional relationships.

C. Attempted to cause, and have caused, Defendant SAINT AGNES MEDICAL CENTER to take disciplinary action against FOBBS by making false accusations against him.

D. Defamed Plaintiff FOBBS' skill and qualifications as a physician and surgeon ...

E. Interfered with granting and retention of full obstetric and gynecological and laser surgical privileges at Defendant SAINT AGNES MEDICAL CENTER, FRESNO COMMUNITY HOSPITAL, CLOVIS COMMUNITY HOSPITAL and THE FRESNO SURGERY CENTER.

F. Caused the individual named defendants practicing at Defendant SAINT AGNES MEDICAL CENTER to dominate all Hospital policy making committees and offices and to place Plaintiff in a false light.

G. Caused Defendant SAINT AGNES MEDICAL CENTER to discriminate against Plaintiff in the rendition of the services that Defendant SAINT AGNES MEDICAL CENTER performs for physicians;

H. Caused Defendant SAINT AGNES MEDICAL CENTER to discriminate against Plaintiff in the manner of reviewing surgical cases, in that they caused Defendant SAINT AGNES MEDICAL CENTER to review the surgical cases of Defendants Drs. NIX, CHRISTENSEN and MELTVEDT and others in a manner which sheltered their practice from critical review.

I. Caused Defendant SAINT AGNES MEDICAL CENTER to discriminate against Plaintiff in the referral of patients needing surgery, so that Defendant SAINT AGNES MEDICAL CENTER regularly referred patients to other physicians rather than to Plaintiff;

J. Refused to provide other medical services to patients who consult Plaintiff for surgery, and otherwise prevented Plaintiff from treating patients whom they regard as their own;

K. Caused Defendants SAINT AGNES MEDICAL CENTER, VALUCARE, a Health Maintenance Organization health provider and THE FRESNO SURGERY CENTER to divert patients of Plaintiff's to other physicians;

L. Refused to extend normal professional courtesies to Plaintiff in the care of his patients.

Plaintiff further alleges that defendants have attempted to "monopolize the practice of obstetrics and gynecology, laser surgery and laparoscopic out patient surgery" by the above-described acts.

**7.** Section 1337 provides, in part,

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies ...

**8.** Rule 56 provides,

(b) A party against whom a claim ... is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

"[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This responsibility is simply one of *pointing out* to the court that there is an absence of evidence to support the nonmovant's case, it is not a responsibility of *producing evidence* showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. at 2554.

When a properly supported motion for summary judgment is made, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The court's function is not to weigh the evidence and determine the truth of the matter. Instead, the court's function is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Id.* at 250, 106 S.Ct. at 2511.

### III. *The Health Care Quality Improvement Act of 1986*

When it promulgated the HCQIA in 1986, Congress made the following findings:

1. The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

2. There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

3. This nationwide problem can be remedied through effective professional peer review.

4. The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.

5. There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.

42 U.S.C. § 11101.

To address the concerns identified in its findings, Congress provided for limited liability in connection with professional review action taken by a professional review body provided that the action meets specified standards.

"Professional review body" is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11).

"Professional review activity" is defined as any activity of a health care entity concerning a particular physician,

(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,

(B) to determine the scope or conditions of such privileges or membership, or

(c) ... judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, *together with the affidavits, if any,* show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law ...
....

(e) ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegation or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided ... must set forth specific facts showing that there is a genuine issue for trial ...

(C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10).

"Professional review action" is defined as,

> an action or recommendation of a professional review body which is taken or made in the conduct of a professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9).

The limitation on damages for professional review actions is set forth in § 11111. This section provides,

> If a professional review action ... of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section—
> (A) the professional review body,
> (B) any person acting as a member or staff to the body,
> (C) any person under a contract or other formal agreement with the body, and
> (D) any person who participates with or assists the body with respect to the action,
>> shall not be liable in damages under any law of the United States or of any State ... with respect to the action. The preceding does not apply to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. and the Civil Rights Acts, 42 U.S.C. 1981 et. seq. Nothing in this paragraph shall prevent the United States or any Attorney General of a State from bringing an action, including an action under section 4C of the Clayton Act, 15 U.S.C.
>> § 15C ... where such an action is otherwise authorized.

42 U.S.C. § 11111(a)(1).

For a professional review body to be protected under § 11111(a)(1), the professional review action of that body must be taken,

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a).

A health care entity is deemed to have met the "adequate notice and hearing procedures" required in § 11112(a)(3) if the physician has been given notice stating:

> (A)(i) that a professional review action has been proposed to be taken against the physician,
> (ii) reasons for the proposed action,
> (B)(i) that the physician has the right to request a hearing on the proposed action,
> (ii) any time limit (of not less than 30 days) within which to request such a hearing, and
> (C) a summary of the rights in the hearing under paragraph (3) ...

42 U.S.C. § 11112(b)(1). This section goes on to discuss the manner in which notice of a hearing must be given and how the hearing must be conducted. It further provides that "[a] professional review body's failure to meet the conditions described in this

subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section."

If a health care entity does any of the following, it must file a report with the Board of Medical Examiners:

(A) takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days;

(B) accepts the surrender of clinical privileges of a physician

(i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or

(ii) in return for not conducting such an investigation or proceeding; or

(C) in the case of such an entity which is a professional society, takes a professional review action which adversely affects the membership of a physician in the society.

42 U.S.C. § 11133(a)(1).

The report made by the health care entity to the Board of Medical Examiners must include the name of the physician, a description of the physician's acts or reasons for the entity's action, and other appropriate information regarding the circumstances surrounding the entity's action. 42 U.S.C. § 11133(a)(3).

Upon the failure of a health care entity to file a report, the Secretary shall conduct an investigation. If, after notice of non-compliance, an opportunity to comply and an opportunity for a hearing, the Secretary determines that the health care entity has failed substantially to report required information, such entity shall not be entitled to the limited liability protection afforded under the HCQIA for a period of three years. 42 U.S.C. § 11111(b).

## IV. *Summary Judgment and the Health Care Quality Improvement Act*

Defendants argue that when Congress enacted the HCQIA, it intended to provide particular defendants with immunity during the early stages of litigation, and not just as a defense to be used at trial. Defendants quote from the legislative history of the HCQIA in support of their conclusion that Congress intended peer review cases to be decided upon motions for summary judgment.

The Committee intends that these provisions allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible. The provisions would allow a court to make a determination that the defendant has or has not met the standard specified in Section 102(a). The Committee intends that the court could so rule even though other issues in the case remain to be resolved. For example, a court might determine at an early stage of litigation that the defendant has met the 102(a) standards, even though the plaintiff might be able to demonstrate that the professional review action was otherwise improper. At that point, it would be in order for the court to rule on immunity. In such a case, the court could still proceed to determine whether injunctive declaratory or other relief would be in order.

H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* 6287, 6384, 6394.

Defendants analogize the immunity provided in the HCQIA with that afforded to government officials as enunciated in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). By passing the HCQIA, argue defendants, Congress balanced the interests of the public in receiving quality health care through effective peer review against the interests of physicians in challenging peer review determinations. Similarly, in *Harlow*, the Supreme Court balanced the interests of the public in seeking the enforcement of their rights against the interests of society in protecting government officials' ability to perform their jobs without threats of liability. In order to determine whether a government official is qualifiedly immune, the Supreme Court developed an objective test in *Harlow* under which the official may assert that her conduct is qualifiedly immune. Defendants assert that the Court used an objective standard to determine

immunity because it was "particularly suitable for disposition by way of summary judgment." As the Court noted,

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

*Id.,* at 818, 102 S.Ct. at 2738.

In the HCQIA, Congress also chose an objective standard,

> Initially, the Committee considered a "good faith" standard for professional review actions. In response to concerns that "good faith" might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action, the Committee changed to a more objective "reasonable belief" standard. The Committee intends that this test will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.

H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* 6287, 6392–94.

Based on the foregoing, defendants conclude that the standard in the HCQIA is similar to the objective standard used in *Harlow.*[9]

### V. *Application of the Health Care Quality Improvement Act to the Facts of this Case*

As a preliminary matter it must be noted that the immunities provided in the HCQIA apply to "professional review actions commenced on or after the date of enactment of the Act, [November 14, 1986]." Pub. Law No. 99–660, § 416. As defendants' first professional review action, the imposition of monitoring restraints, occurred on June 23, 1987, the professional review actions at issue here occurred after the effective date of the Act.

Defendants assert that there are two distinct professional review actions at issue here: the imposition of the June 23, 1987, monitoring restraints on plaintiff, and the August 26, 1988, summary suspension of plaintiff. Defendants address these two actions separately, arguing that the HCQIA standards were met in each.

Plaintiff counters that defendants' conduct, taken as a whole, consists of professional review activity and, because professional review action encompasses professional review activity, defendants' entire course of conduct, not just two discrete actions, is subject to evaluation. Consequently, plaintiff argues that for defendants to qualify for immunity, their entire conduct must meet the standards set forth in 42 U.S.C. §§ 11111–11152.

■ As noted *supra,* § 11151(9) defines professional review action as that taken in the conduct of professional review activity and as including professional review activities relating to a professional review action. Section 11151(10) defines professional review activity as an activity to determine a physician's clinical privileges, the scope and condition of such privileges and any change or modification of privileges. To paraphrase Mr. Justice Scalia, the court finds this definition about as helpful in determining the correct application of this Act as "life is a fountain." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492

---

**9.** As a matter of interest, to the court's knowledge, the District Court for the Central District of California is the only court in the Ninth Circuit which has been called upon to interpret the HCQIA and determine whether the summary judgment stage is the appropriate point at which to determine the immunity of the defendants. In that case, *Austin v. McNamara* 731 F.Supp. 934 (1990), the district court granted defendants' motion for summary judgment, finding that the HCQIA immunized defendant hospital and individual physician defendants from federal antitrust liability for their conduct in connection with the suspension and subsequent reinstatement of plaintiff's staff privileges. The court determined that the defendants' actions were in the interest of furthering the quality of health care at defendant hospital, and were only taken after extensive evaluations, monitoring and hearings at which plaintiff was allowed to defend himself. *Austin* is currently on appeal to the Ninth Circuit.

U.S. 229, 109 S.Ct. 2893, 2907, 106 L.Ed.2d 195 (1989) (concurring opinion). However, using what small clues of interpretation that Congress provided in the language of these sections, the court believes that professional review activity means the investigative process during and/or upon which a professional review action, i.e., a decision, is made. The professional review action/decision is borne of the investigative process and may entail a secondary level of additional, more narrowed investigation as needed based on information discovered during the initial investigation. This leaves the question "for what does the HCQIA provide immunity?"

 The HCQIA provides immunity for discrete professional review actions/decisions which meet particular standards, i.e., reasonable belief that the action furthered quality health care, fact gathering, notice and hearing, and a resulting reasonable belief that the action taken was warranted. The HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability for its ultimate decision. Two reasons support this conclusion. First, it would be impossible to apply the § 11112(a) standard to acts which are encompassed within the standard. For example, the standard requires that reasonable efforts be made to obtain the facts of the matter, the facts of the matter meaning those upon which the professional review action was based. These facts will be called facts "Y". Plaintiff would apparently require that the whole § 11112(a) standard apply to the process of gathering facts "Y". In other words, before a fact "Y" investigation is undertaken plaintiff would require that a reasonable effort be made to obtain the facts supporting the act of initiating a fact "Y" investigation, in addition to adequate notice and hearing regarding the fact "Y" investigation. This is nonsensical. The standard is intended to apply to discrete decisions, not to an ongoing course of conduct.

Second, because the HCQIA provides protection for particular health care defendants, its application is invoked by defendants. Consequently, a defendant, in effect, must act as a tailor and match particular professional review actions which it has taken with the allegations of a plaintiff's complaint. That is what defendants have attempted to do here. As outlined above, plaintiff's complaint makes many general allegations. It would be a nearly insurmountable chore for these defendants, or any defendants, to attempt to prove HCQIA immunity for each aspect of their entire course of conduct in response to a plaintiff's general allegations of misconduct. Such a duty would reduce the efficaciousness of the HCQIA and defeat Congress' stated purpose in promulgating it. Defendants have attempted to invoke HCQIA immunity in the only apparent reasonable manner, i.e., by setting forth two discrete professional review actions (not all of the professional review activity connected therewith) and then measuring them up against the HCQIA standards. Therefore, the following discussion addresses the two professional review actions as identified by defendants and the manner in which defendants presented them.

A. The Professional Review Action of June 23, 1987

1. § 11112(a)(1)—Was the Imposition of a Monitoring System Taken in the Reasonable Belief that it was in the Furtherance of Quality Health Care?

 Quoting from the legislative history of the HCQIA, defendants assert that this prong is met if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, reprinted in 1986 U.S. Code Cong. & Admin.News 6287, 6393. Defendants assert that the MEC voted to impose monitoring restraints on plaintiff "in the interest of furthering quality health care at Saint Agnes Medical Center." The MEC reached the decision to impose a monitoring system after reviewing a small number of plaintiff's cases wherein the quality of care was considered

below St. Agnes' standards, after allowing plaintiff an opportunity to discuss these cases, and after seeking an outside evaluation of these cases. Following imposition of the monitoring system the Supervisory Committee conducted further review of other of plaintiff's cases and gave notice of plaintiff of formal charges to be heard by the JRC. In two subsequent hearings the JRC decided to continue the monitoring system. Admitting that these two hearings did not follow proper procedure in that plaintiff was not allowed to voir dire members of the JRC, defendants agreed to a third JRC hearing in which plaintiff would be given the opportunity to voir dire the JRC members. Plaintiff opted not to participate in this hearing. Voir dire of the new JRC members conducted by the hearing officer revealed that each member felt he or she could reach an impartial decision. The JRC then determined that plaintiff did not have good cause for failing to participate in the hearing and deemed him to have accepted the monitoring restraints.

In addition to the foregoing, defendants also point out that the Voluntary Settlement Agreement entered into between the OCR and St. Agnes shows that the OCR did not find the monitoring system inappropriate in light of the circumstances. Thus, defendants conclude that, "based on the information available to it at the time of imposition of the monitoring and consultation requirements, it was reasonable for the MEC to conclude that the action was necessary to ensure patient safety."

As a preliminary matter plaintiff argues that although a reasonable belief standard is used to determine whether or not the action in question was taken in furtherance of quality health care (citing *Austin v. McNamara*, 731 F.Supp. 934 (1990)), "questions of the reasonableness and good faith of the Defendants' actions are factual questions properly determined by a jury." The court disagrees with plaintiff, finding, as did the *Austin* court, that the question of immunity is a matter of law.

In any event, plaintiff asserts that the reasonable belief standard was not met here. He contends that the number of cases initially investigated and upon which the monitoring restraints were imposed, four, was too small [10].

The court is satisfied that defendants imposed the monitoring restraints in the reasonable belief that doing so would promote quality health care. Defendants' act of imposing the monitoring system was prompted by the concern that plaintiff was providing substandard care. Plaintiff was given the opportunity to discuss the original four cases and was apparently unable to assuage defendants' concern. Accordingly, defendants appropriately dealt with the perceived situation in imposing the restraints and making the decision to conduct additional investigation.

2. *§ 11112(a)(2)—Was the Monitoring System Imposed After a Reasonable Effort to Obtain the Facts of the Matter?*

Arguing that it made a reasonable effort to obtain pertinent facts in this matter, defendants point to the Supervisory Committee's review of eight of plaintiff's cases, the fact that the Committee sought independent review of three of these cases, and the fact that plaintiff was given an opportunity to discuss his management of these cases. This, assert defendants, amounts to "diligent efforts to gather relevant facts in compliance with Section 11112(a)(2)."

Plaintiff contends that there is a triable issue of fact as to whether defendants made reasonable efforts to obtain the facts of the matter. For example, plaintiff notes that when defendants requested an independent review of three of his cases, the reviewer was not furnished with complete files.

The court is satisfied that defendants made a reasonable effort to obtain the facts of the matter. Prior to the imposition of the monitoring system defendants reviewed four of plaintiff's cases and gave

**10.** Plaintiff makes other assertions in connection with this requirement which are more appropriately treated with the regard to the rea-sonableness of defendants' belief that the action taken was warranted.

plaintiff the opportunity to discuss these cases.[11] After the monitoring began defendants continued to gather facts, conducting both additional internal investigation of plaintiff's cases and asking an outside professional, Dr. Ostergard, to evaluate three of plaintiff's original four cases [12].

### 3. § 11112(a)(3)—Was Plaintiff Afforded Adequate Notice and Hearing Procedure?

■■■ As noted above, § 11112(b) provides the conditions which a health care entity must meet in order to provide adequate notice and hearing. As also noted above, § 11112(b) provides that the failure of a review body to meet these conditions does not, per se, constitute failure to meet the standards of § 11112(a)(3).

With regard to the § 11112(a)(3) standards, defendants again quote from the legislative history of the HCQIA: "[i]f other procedures are followed, but are not precisely of the character spelled out in [§ 11112(b)], the test of 'adequacy' may still be met under other prevailing law." H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, reprinted in 1986 U.S.Code Cong. & Admin.News 6384, 6396. Defendants also note that § 11112(c)(2) provides that for the purposes of § 11112(a), nothing in § 11112 should be construed as "precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." Accordingly, defendants assert that they believed the action of beginning a monitoring system was necessary to protect patient safety, but

that they gave plaintiff adequate notice and hearing procedure after the monitoring system commenced by (1) providing notice to plaintiff on June 23, 1987, that a professional review action (the monitoring system) had been taken; (2) notifying plaintiff that he had the right to request a hearing; and (3) providing plaintiff with the opportunity to participate in a remand JRC hearing (after acknowledging that the original JRC hearings were defective in that plaintiff lacked the opportunity to voir dire the JRC members). Plaintiff, however, did not appear at the remand hearing. Therefore, defendants argue, plaintiff forfeited his right to the hearing by failing, without good cause, to appear. Section 11112(b)(3)(B) specifically states that "the right to the hearing may be forfeited if the physician fails, without good cause, to appear."

Plaintiff responds that the procedures provided him were grossly inadequate. In support of this contention he points to the fact that defendants have admitted that he should have been permitted to voir dire the original members of the JRC.[13] Plaintiff argues that this, alone, should prevent defendants from claiming immunity under the HCQIA.

Also on the issue of the composition of the JRC, plaintiff asserts that fairness would require that the JRC be composed of physicians who were not his direct competitors, and that at least one of them should have been versed in laser surgery.

In addition plaintiff further asserts that he was not given notice that the additional four cases would be considered. This assertion is expressly contradicted by Exh. B

---

11. The court would note here that even if such effort to obtain facts had not been made § 11112(c)(2) allows for the immediate restriction of clinical privileges, subject to subsequent notice and hearing, where the failure to take such an action may result in an imminent danger to the health of any individual.

12. Plaintiff's assertion that Dr. Ostergard was not initially supplied with complete patient charts is true. However Dr. Ostergard testified during the January 25, 1988, hearing that he was subsequently supplied with complete files for all four patients except the post-procedure chart of one patient.

13. To demonstrate the importance of voir dire plaintiff asserts that the original members of the JRC had "over-lapping" functions,

> Dr. Meltvedt was a member of both the initial accusing body and the subsequent investigatory body. Dr. Bergman was a member of the Judicial Review body, but was married to a member of the initial accusing body. Numerous members of the Judicial Review Committee received referrals from or participated in partnerships with the members of the initial accusing body.

to the Declaration of V. Roy Smith. However, even if plaintiff did not receive notice of the use of these four cases, the JRC's consideration of them was appropriate. As the Act's legislative history states,

> [t]he Committee is aware that between the time the initial notice is given of a proposed professional review action and the time of the hearing on that action, the investigation may have uncovered reasons for such an action other than or in addition to the reasons specified in the initial notice. Provided that notice is given in a way that protects the interests of the physicians against whom the action is proposed, a supplemental notice of such additional reasons might well satisfy the requirements of due process.

H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* 6384, 6394.

Plaintiff also argues that defendants' manner of giving him notice that his privileges were restricted after the fact was not fair. In other words, he contends that, barring an emergency "threaten[ing] imminent danger to the health of any individual," process was due before defendants restricted his privileges. Plaintiff asserts that no such emergency existed at the time the monitoring system was established or at the time of his suspension. He additionally contends, without support, that "the Defendants tolerated [his] refusal to abide by the summary restrictions for over a year. If Defendants believed that such failure endangered patient health, they would have acted."

There is no dispute that plaintiff was given notice of the JRC hearings. Therefore the question is whether or not the JRC hearings provided adequate procedure. Plaintiff is correct in his assertion that the first two JRC proceedings were inadequate in that he was not allowed to conduct voir dire of the JRC members. However, defendants recognized this defect and agreed to provide a third hearing in which plaintiff would be able to voir dire the potential JRC members. Plaintiff is also correct in his assertion that it is preferred that the members of the JRC not be in direct economic competition with him. § 11112(b)(3)(A)(ii) and (iii). However, "[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the [notice and hearing requirements]." § 11112(b)(3). The court is satisfied that plaintiff was given the opportunity to adequate process, but that he opted not to exercise his right thereto. As § 11112(b)(3)(B) provides, the right to a hearing is forfeited if, absent a showing of good cause, the physician fails to appear. It has been established that the defect of which plaintiff complained, i.e., voir dire of the allegedly biased JRC members, had been acknowledged and would be remedied at the remand hearing. Consequently, plaintiff's failure to appear was not supported by good cause.

### 4. *§ 11112(a)(4)—Did Defendants Act in the Reasonable Belief that the Monitoring System was Warranted?*

■ Defendants do not specifically address this requirement, presumably encompassing it in their foregoing argument. Plaintiff merely states that "since the fourth requirement for immunity incorporates the first three, there are also triable issues as to that requirement." Accordingly, the court must piece together the parties' arguments on this, the most important of the four requirements, based on their foregoing contentions.

Having carefully considered the documentary evidence submitted by both parties, the court is concerned by the fact that defendants decided to continue the monitoring system despite the fact that Dr. Ostergard concluded that plaintiff had provided adequate care in two of the three original cases and that, with regard to the third case, two other doctors agreed that plaintiff's actions therein were reasonable[14]. The court is aware that there is often more

---

**14.** The court's concern is somewhat intensified by the fact that numerous other submissions by plaintiff reflect that other outside evaluators believe that his handling of the eight cases on contention was generally adequate. However, the court would note that such submissions, found in Exh. JJ–NN, are not claimed to have been submitted to the JRC when it rendered its decision.

than one manner in which to handle a particular medical condition and/or procedure, and that the selection of one alternative over another does not render the care chosen substandard. However, it is also true that those who would make the opposite selection are not necessarily unreasonable in their criticism of the care chosen. Keeping this and the legislative purpose underlying the HCQIA in mind, the court must determine whether or not defendants' decision to maintain the monitoring system was reasonable after fact finding conducted by defendants had occurred and the opportunity for an adequate hearing had passed.

■ Defendants argue they are entitled to a rebuttable presumption that imposition of the monitoring system was warranted, and that plaintiff has failed to carry his burden of rebuttal. § 11112(a). Defendants are only partially correct regarding plaintiff's burden to rebut. In the same legislative history from which defendants quote so extensively, it is clear that the presumption provided in § 11112(a) refers only to the reasonable belief standard of § 11112(a)(1), not to the reasonable belief standard of § 11112(a)(4):

> [r]eflecting the Committee's belief that [the objective "reasonable belief"] standard will be met in the overwhelming majority of professional review actions, the subsection provides a presumption to that effect, requiring a plaintiff to show, by clear and convincing evidence, that no such reasonable belief existed *at the time of the professional review action. This presumption applies only to the reasonable belief standard, not to the other standards.* Those additional standards require a group engaged in peer review to make a reasonable effort to obtain the facts, to provide adequate due process, and to have a reasonable belief that the professional review action was warranted by the facts known.

H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, *reprinted in* 1986 *U.S.Code Cong. & Admin.News* 6384, 6393 (emphasis added).

Accordingly, defendants are not entitled to a presumption of reasonableness with regard to § 11112(a)(4). Nevertheless, without expressing an opinion regarding the "correctness" of defendants' act, the court finds that defendants maintained an objectively reasonable belief that their decision to retain the monitoring restrictions was warranted as required by § 11112(a)(4). The facts show that defendants saw a need to investigate plaintiff's cases, that they thereafter imposed the monitoring restrictions but continued to investigate, that the opportunity to have an adequate hearing was offered to plaintiff, albeit after two prior attempts, but that he declined to participate without good cause, and that the foregoing provide support for defendants' decision to retain the monitoring system. Furthermore, it is undisputed that defendants met the requirements of § 11133 by filing with the Medical Board of California the appropriate records regarding the imposition of the monitoring system on plaintiff. Accordingly, immunity extends to physician-defendants and corporation-defendants under the HCQIA in their capacity as a professional review body with regard to the professional review action of imposing the monitoring system on plaintiff.

**B. The Professional Review Action of August 26, 1988[15]**

**1. *§ 11112(a)(1)—Was Plaintiff's Suspension Imposed in the Reasonable Belief that it was in the Furtherance of Quality Health Care?***

■ Defendants contend that their decision to summarily suspend plaintiff was made in the reasonable belief that to do so was in the furtherance of quality health care. In support of this contention defendants state that the MEC believed plaintiff's failure to comply with the monitoring system could result in a likelihood of significant impairments of the life, health and safety of plaintiff's patients. Defendants point to the fact that the Voluntary Settlement Agreement between the OCR and St.

---

**15.** Plaintiff does not respond to defendants' August 26, 1988, professional review action of summarily suspending his privileges. Impli-

edly, he relies on his arguments in the above discussed professional review action.

Agnes also contained monitoring requirements, drawing therefrom the inference that the OCR also believed the monitoring system was necessary to ensure patients' safety.

2. *§ 11112(a)(2)—Was the Plaintiff's Suspension Imposed After a Reasonable Effort to Obtain the Facts of the Matter?*

After plaintiff performed an un-monitored Caesarean Section the MEC provided plaintiff with the opportunity to meet and discuss his compliance with the monitoring restraints. At that meeting plaintiff informed the MEC that he did not plan to comply with the monitoring system in the future. Defendants argue that by reason of this meeting, they must be found to have taken a reasonable effort to obtain pertinent facts.

3. *§ 11112(a)(3)—Was Plaintiff Afforded Adequate Notice and Hearing Procedures?*

Defendants notified plaintiff of his suspension for failure to comply with the monitoring system by memorandum dated August 26, 1988. In that same memorandum defendants informed plaintiff of his right to request a hearing. Plaintiff subsequently declined to exercise his right to a hearing. Defendants contend that the foregoing fulfilled their obligation to provide plaintiff with adequate notice and hearing procedures.

4. *§ 11112(a)(4)—Was Plaintiff's Suspension Imposed in the Reasonable Belief that Such Action was Warranted?*

The facts show that upon discovering plaintiff's noncompliance with the monitoring system he was summarily suspended, that defendants subsequently attempted to gather facts relating to plaintiff's action and were informed by plaintiff that he had no intention of complying with the monitoring system in the future, that plaintiff waived his right to a hearing on this matter, and that defendants filed a report notifying the California Board of Medical Quality Assurance of plaintiff's suspension in accordance with § 11133. Without ex-

pressing an opinion regarding the "correctness" of defendants' act, the court is satisfied that defendants' professional review action of suspending plaintiff was objectively reasonable and warranted in light of the facts. Accordingly, immunity extends to physician-defendants and corporation-defendants under the HCQIA in their capacity as a professional review body with regard to the professional review action of suspending plaintiff.

## VI. *Applicability of California Law*

 California law is not applicable to the question of federal immunity under the HCQIA to a federal claim based on the Sherman Antitrust Act.

ACCORDINGLY, IT IS ORDERED that defendants' motion for summary judgment as to plaintiff's Sherman Act cause of action is granted.

JUDGMENT TO BE ENTERED.