**WALLS REGIONAL HOSPITAL,
et al., Relators,**

v.

**Hon. Tommy ALTARAS, Judge, County
Court at Law No. One Johnson
County, Texas, Respondent.**

No. 10–94–341–CV.

Court of Appeals of Texas,
Waco.

Dec. 30, 1994.

James E. Ferguson & James R. Claunch, Ferguson & Claunch, Fort Worth, for real party at interest.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

THOMAS, Chief Justice.

This is an original proceeding for a writ of mandamus filed by Relators, Walls Regional Hospital, its administrator, Steve D. Porter, assistant administrator Sheila White, chief of medical staff Dr. Todd E. Linstrum, and chairman of the board of trustees Sam Walls, against Respondent, Honorable Tommy Altaras, judge of the County Court at Law No. 1 of Johnson County. The real party in interest is Dr. Robert Roe. Relators seek the writ to require Judge Altaras to dissolve his order of November 18, 1994, in which he "continued" the hospital's hearing on Dr. Roe's application for reappointment to staff membership and clinical privileges. Judge Altaras "continued" the hospital's hearing until he could hold a pretrial hearing in a cause pending on his docket, No. C94–00244, in which Dr. Roe is the plaintiff and relators are defendants. Relators contend that Judge Altaras' order is void for two reasons: (1) the court lacked jurisdiction to enter the order because Dr. Roe failed to exhaust his administrative remedies under the hospital's bylaws; and (2) rather than being a continuance, the order is an injunction that fails to comply with Rules 683 and 684. See Tex. R.Civ.P. 683, 684. Relators also allege in an additional brief and supplemental petition that, by contractually agreeing to be bound by the hospital's bylaws, Dr. Roe has placed himself in a position similar to a person who has contractually agreed to arbitration and, for that reason, a writ of mandamus is available to prohibit Judge Altaras from interfering with the hospital's administrative proceedings before they are completed. *See Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266 (Tex.1992). We will conditionally grant the writ.

Russell E. Wilson, Decker, Jones, McMackin, McClane, Hall & Bates, Fort Worth, and Andy McSwain, Fulbright, Winniford, Bice & Marable, Waco, for relators.

## PROFESSIONAL PEER REVIEW

Congress enacted the Health Care Quality Improvement Act of 1986 (HCQIA) to set minimum national standards for the professional peer review of physicians' competence and professional conduct. 42 U.S.C.A. §§ 11101–11152 (West Pamph.1994). The act grants a professional review body meeting all of the act's standards, and any person participating in, assisting, or providing information to the professional review body, immunity from damages under any federal or state law with respect to the professional review action. *Id.* § 11111(a)(1), (2), (b). States can adopt their own peer-review procedures as long as they do not fall below the minimum national standards. *Id.* § 11115(a).

The legislature amended the Texas Medical Practice Act to adopt and apply the provisions of the HCQIA to actions of a professional review body. TEX.REV.CIV.STAT.ANN. art. 4495b, § 5.06(a) (Vernon Supp.Pamph. 1995). Like the federal act, the legislature granted immunity from civil liability to any hospital, person, or professional review body that, without malice, participates in or furnishes records or information to a professional review body. *Id.* § 5.06(m). A "professional review body" includes a committee of a health-care entity, the governing board of a health-care entity or the medical staff of a health-care entity, provided the committee or medical staff operates "pursuant to written bylaws that have been approved by the policy-making body or the governing board of the [hospital] and authorized to evaluate the quality of medical and health-care services or the competence of physicians." *Id.* § 1.03(a)(6). Such a committee includes the committee's employees, agents, assistants, investigators, as well as intervenors, attorneys, and any other persons or organizations that serve the committee in any capacity. *Id.*

Recognizing that hospitals are responsible for determining medical staff appointments or the qualifications of physicians, the legislature authorized hospitals:

to adopt reasonable rules, regulations, and requirements relating to qualifications for medical staff appointments, reappointments, termination of appointments, the delineation of clinical privileges, or the curtailment of clinical privileges of those who are appointed to such medical staff ... so long as such rules, regulations, and requirements are determined upon a reasonable basis, such as professional and ethical qualifications of the physician, upon standards that are reasonable, applied untainted by irrelevant considerations, supported by sufficient evidence, free of arbitrariness, capriciousness, or unreasonableness and do not differentiate solely upon the academic medical degree held by such physician.

*Id.* § 1.02(9).

## THE HOSPITAL'S BYLAWS

On September 15, 1992, the medical staff of Walls Regional Hospital adopted Medical Staff Bylaws governing professional peer review of physicians' competence and professional conduct.[1] No physician can admit or treat any patient or exercise clinical privileges at the hospital unless he or she first becomes a member of its medical staff. *See* WALLS REGIONAL HOSPITAL MEDICAL STAFF BYLAWS § 5.1. Each applicant for appointment or reappointment to the medical staff agrees to be bound by the bylaws, which include a requirement that a physician "conduct himself in a professional, courteous and reasonable manner at all times and refrain from disruptive behavior or acting in a manner unbecoming of a Practitioner." *Id.* § 5.4(m); *also* § 9.1. The hospital's board of trustees has final approval of all reappointments to the medical staff. *Id.* § 9.3.1.

Section 9.9 of the bylaws governs the procedure for reviewing applications for reappointment. Briefly summarized, the review procedure begins with the chief of the department in which the physician is requesting clinical privileges, whose recommendation is then forwarded to the Quality Improvement–Credentials Committee (QI Committee) for its review. *Id.* §§ 9.9.1, 9.9.2. If the recommendation of the QI Committee is favorable, then its recommendation is passed to the Medical Executive Committee for its review. *Id.* § 9.9.3(a). Likewise, if the Med-

---

1. The hospital's board of trustees approved the bylaws on October 10, 1992.

ical Executive Committee and QI Committee both approve the application, it is then transmitted to the Board of Trustees for its final approval or disapproval. *Id.* § 9.9.4(a). If the board refuses to approve the application for reappointment, after receiving favorable recommendations from the QI Committee and Medical Executive Committee, the matter is returned to the Medical Executive Committee, which notifies the physician in writing of the unfavorable recommendation. *Id.* § 9.9.5(b).

Upon receiving from the board an unfavorable recommendation for reappointment, the physician is entitled to a hearing and the procedural rights under section 11.3 of the bylaws, which include written notice of the proposed professional-review action and reasons for the proposed action, the right to request a hearing, and a summary of the physician's rights at the hearing. *Id.* § 11.3.2. The physician's procedural rights are set forth in subsections (c) and (d) of section 11.3.4. *Id.* § 11.3.4(c), (d). If the physician timely requests a hearing, then the hospital must appoint either a hearing officer or a hearing panel to hear the matter. *Id.* § 11.3.4(a). Following the hearing, the hearing officer or hearing panel makes a written recommendation, with findings, to the Medical Executive Committee. *Id.* § 11.3.5. The sequence of review then begins anew, with the Medical Executive Committee's recommendation being finally reviewed by the Board of Trustees. *Id.* §§ 11.4, 11.5. As already noted, the board's decision is final. *Id.* § 11.5(c).

## DR. ROE'S APPLICATION

Dr. Roe's application for reappointment for a two-year term received favorable recommendations from the QI Committee and Medical Executive Committee, but the Board of Trustees denied him reappointment based on "disruptive behavior." As required by the bylaws, the Medical Executive Committee notified him of the board's unfavorable recommendation, which included written grounds and reasons for the unfavorable action. When Dr. Roe timely requested a hearing, the Medical Executive Committee appointed a hearing officer, provided Dr. Roe

a list of potential witnesses and a synopsis of their testimony, and originally scheduled a hearing on his application for reappointment for August 30 and September 6, 1994. It also furnished him a list of incidents and accompanying documentation. Judging from the synopsis of the testimony of potential witnesses and the list of incidents, allegations of his disruptive behavior range from sexual harassment of nursing personnel to the use of inappropriate, profane, derogatory, abusive and unprofessional language with patients, medical staff, nursing and administrative staff.

On August 22 Dr. Roe filed suit (No. C94–00244) in Judge Altaras' court against the hospital, its administrator and assistant administrator, chief of medical staff, and chairman of the board, alleging that:

- he has unsuccessfully requested that all charges and evidence to be used against him be reduced to writing and furnished him;
- he does not have enough information in his possession to prepare a defense to the allegations against him;
- he is being denied due process of law;
- Steven D. Porter and Sheila White, the hospital's administrator and assistant administrator, are engaged in a civil conspiracy to deny him staff privileges, have solicited complaints from persons against him, and have threatened personnel if they did not complain;
- the Board of Trustees have violated the bylaws and other rules and regulations, which denies him due process; and
- he will suffer irreparable harm and injury unless the hospital, its administrative officers, and board are enjoined from terminating his staff privileges until he has an opportunity to be heard at a hearing that meets the requirements of due process.

Dr. Roe did not allege, nor does he contend, that the procedures in the bylaws do not comply with the HCQIA.

The hearing on Dr. Roe's application for reappointment, originally scheduled for August and September, was postponed and rescheduled for November 21–22. In advance

of the hearing, however, Dr. Roe filed a motion in No. C94–00244, alleging that the hospital's attorney, Kenneth Kramer, had met with the Board of Trustees to discuss the subject of the administrative hearing, *i.e.*, whether he should be reappointed. He claimed that the Board is now "tainted" by the improper contact with Kramer and could no longer be an impartial arbiter of his reappointment, which due process requires. Consequently, he requested that the court "disqualify" the Board of Trustees, "take jurisdiction of this case and remove the administrative hearing before the Board of Trustees ... to the County Court at Law and to conduct such hearing in a manner consistent with the due process rights of Dr. Roe." Furthermore, he asked the court to: (1) limit the hearing officer to considering only an incident involving Susan Seary; (2) prohibit proof and consideration at the administrative hearing of any incident pre-dating his prior reappointment to staff privileges in 1992; (3) require testimony at the administrative hearing to be elicited under the Rules of Civil Procedure; and (4) order that no hearsay testimony be admitted at the administrative hearing.

On November 1 Dr. Roe also moved to have the court prohibit several potential witnesses from testifying at the review hearing because they had either not filed a complaint against him with the QI Committee, they were asserting a stale complaint or complaints already considered by the QI Committee, or their testimony would be hearsay.

Dr. Roe's motions for orders relating to the November 20–21 hearing were apparently set for a hearing before Judge Altaras on November 3, but the hearing was postponed due to the illness of the hospital's local counsel. On November 10 Dr. Roe filed a motion asking Judge Altaras to indefinitely "delay" or "continue" the hearing on his application for reappointment until the hospital's counsel can return to court or "until more specific news on the health of [the] defense attorney ... can be ascertained." On November 18 Judge Altaras signed an order "continuing" the hospital's professional-review hearing until after he holds a pretrial hearing in No. C94–00244.

## DID COURT HAVE JURISDICTION?

Relying on *Sweeny Community Hosp. v. Sayeed,* 683 S.W.2d 813, 814 (Tex.App.—Houston [14th Dist.] 1984, no writ), a case with facts virtually identical to these, Relators contend the court lacked *jurisdiction* to enter the November 18 order because Dr. Roe failed to exhaust the administrative remedies available to him under the bylaws before seeking a legal remedy. The *Sayeed* court apparently relied on two decisions as legal authority for its holding that the court lacked jurisdiction under similar circumstances: *Tex. Alcoholic Bev. Commission v. Lancaster,* 563 S.W.2d 380 (Tex.Civ.App.—San Antonio 1978, no writ) (holding that court lacked jurisdiction to issue injunctive relief because of failure to exhaust administrative remedies, as required by the Administrative Procedure and Texas Register Act), and *Daniel v. Dallas Independent School District,* 351 S.W.2d 356, 358 (Tex.Civ.App.—El Paso 1961, writ ref'd n.r.e.) (holding that court lacked jurisdiction of school employee's suit for wrongful discharge when employee failed to exhaust administrative remedies for appealing discharge). Although the holding in *Sayeed* is on point, we nevertheless reject it as incorrect.

The authority relied on by the *Sayeed* court is highly suspect, if not totally inapposite to the circumstances there and here. The *Lancaster* case involved an appeal from the decision of a state agency that is subject to the Administrative Procedure Act, which expressly requires exhaustion of all available administrative remedies prior to judicial review. TEX.GOV'T CODE ANN. § 2001.171 (Vernon Pamph.1995); *Lancaster,* 563 S.W.2d at 381. That act is clearly not applicable here because Walls Regional Hospital is not a state agency. *See* TEX.GOV'T CODE ANN. § 2001.003(7). Nor is this a case, like *Daniel,* involving the judicial review of a decision of a local school district, an administrative-review procedure provided by statute. *See Daniel,* 351 S.W.2d at 357–58.

■■■ Jurisdiction, which is the power to hear and determine a controversy, is that portion of judicial power a court is expressly authorized to exercise by the constitution or

statute. *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398 (Tex.1979); *Martin v. Sheppard,* 145 Tex. 639, 201 S.W.2d 810, 813 (1947). It is not something the parties can confer by consent or waiver or abrogate by agreement. *International Travelers' Ass'n v. Branum,* 109 Tex. 543, 212 S.W. 630, 632 (1919) (holding that public policy prohibits parties from bargaining away court's jurisdiction); *Scheetz v. Bader,* 251 S.W.2d 427, 429 (Tex.Civ.App.—Galveston 1952, writ ref'd).

■ We are not aware of any statute that requires Dr. Roe to exhaust all internal-review remedies available under the bylaws before the court can exercise the subject-matter jurisdiction otherwise granted it by statutes and constitution.[2] The HCQIA, the Texas Medical Practice Act, and the hospital's bylaws contain no such requirement. Absent a specific statute expressly staying or withdrawing the court's jurisdiction pending completion of the professional-review process, we hold that the November 18 order is not void for want of jurisdiction.

We do not reach the questions raised by Relators' second contention. Is the November 18 order void because it is an injunction that does not comply with Rules 683 and 684? *See* Tex.R.Civ.P. 683, 684. If otherwise void, can the order be attacked by a writ of mandamus?

## NATURE OF THE PROCEEDING

We briefly examine the nature of the professional-review proceeding in which Dr. Roe is involved. What is clear from the congressional and legislative findings is that both legislative bodies acted out of paramount concern for the public interest. 42 U.S.C.A. § 11101; Tex.Rev.Civ.Stat.Ann. art. 4495b, § 1.02(1). Accordingly, we consider the review process sanctioned and encouraged by the statutes to be likewise charged with the public interest.

■ Neither the HCQIA nor the Texas Medical Practice Act requires the hospital to develop the professional-review process. Nor is participation of any person or entity mandated by statute. Voluntary participation is encouraged by the grant of immunity against damage claims. Thus, the hospital's participation is the voluntary act of a private entity, and all those participating in the review process are likewise acting voluntarily. Congress and the legislature clearly intended for the national standards to be enforced by and through a private-entity review process, rather than through a governmental administrative agency, and to that end delegated and assigned to a properly organized professional review body the responsibility and authority of a quasi-judicial body.[3] *See Austin v. McNamara,* 731 F.Supp. 934, 938 (C.D.Cal.1990) (referring to a professional review committee as a "quasi-judicial body"), *affirmed,* 979 F.2d 728 (9th Cir.1992). Moreover, the review process outlined in the bylaws is contractual because, as already noted, a physician applying for reappointment agrees to be bound by the bylaws. *See Gonzalez v. San Jacinto Methodist Hosp.,* 880 S.W.2d 436, 438–39 (Tex.App.—Texarkana 1994, writ denied). What is involved here, then, is an internal, private, contract-based professional review body performing the functions usually assigned to an administrative agency. Technically, however, it is not an administrative proceeding of a government agency.

## EXHAUSTION DOCTRINE

■ The doctrine[4] requiring exhaustion of administrative remedies did not originate by constitutional or statutory mandate but was judicially created to further important

---

**2.** We asked the parties to brief the question of whether any statutory authority requires Dr. Roe to exhaust the review process before resorting to court, and they could find none.

**3.** "Quasi-judicial" is a term applied to the acts of administrative officers or bodies, who are required to investigate or ascertain the existence of facts, hold hearings, exercise discretion, and draw conclusions from facts as a basis for their official actions. Black's Law Dictionary 1121 (5th ed. 1979).

**4.** "[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corporation,* 303 U.S. 41, 41, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938).

policy considerations. *McCarthy v. Madigan*, 503 U.S. 140, 144–47, 112 S.Ct. 1081, 1086–87, 117 L.Ed.2d 291 (1992); *McKart v. United States*, 395 U.S. 185, 192–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969). Although codified into various statutory schemes—most notably, as part of the Administrative Procedure Act—the doctrine is applicable nevertheless to cases not governed by the Administrative Procedure Act. *Darby v. Cisneros*, — U.S. —, —, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993). Legislative intent is critically important in determining whether a court is precluded by statute from applying the exhaustion doctrine or is left free to exercise its judicial discretion in the matter. *Id.*, — U.S. at —, 113 S.Ct. at 2543.

Major policy considerations underlying the doctrine's application are present here. *See McCarthy*, 503 U.S. at 144–47, 112 S.Ct. at 1086–87; *McKart*, 395 U.S. at 192–95, 89 S.Ct. at 1662–63.

NON–INTERFERENCE RECOGNIZES SPECIAL EXPERTISE

■ The federal and state enactments evidence a clear legislative intent to place the professional-review process primarily in the hands of those uniquely qualified by expertise to conduct it—a physician's peers in the medical community. For this reason a court should hesitate to interfere in a process where its expertise is profoundly lacking. The hospital's internal-review process will apparently determine whether Dr. Roe's professional conduct is so aberrant and disruptive that it negatively affects the delivery of quality health care at the hospital. That decision and undertaking is best left to the professional review body legislatively sanctioned for that purpose.

NON–INTERFERENCE PROMOTES LEGISLATIVE OBJECTIVES

By interfering with the review process prior to its completion, a court not only weakens the effectiveness of professional review but encourages others to ignore it. Either result would emasculate legislative intent and defeat the public interest. On the other hand, requiring a physician to exhaust the review process prior to seeking legal recourse for an adverse determination clearly meets the legislative objectives and assigns to the review process the importance it deserves.

NON–INTERFERENCE ENHANCES JUDICIAL REVIEW

Premature judicial interference with the review process could hinder or even preclude judicial review. Judicial review of professional-review proceedings usually occurs in the context of a suit for damages by the adversely-affected physician against those who participated in the process.[5] *E.g., Maewal v. Adventist Health Systems*, 868 S.W.2d 886 (Tex.App.—Fort Worth 1993, writ denied); *Manion v. Evans*, 986 F.2d 1036 (6th Cir.), *cert. denied sub. nom., Lima Memorial Hosp. v. Manion*, — U.S. —, 114 S.Ct. 71, 126 L.Ed.2d 40 (1993); *Austin v. McNamara*, 979 F.2d 728 (9th Cir.1992); *Smith v. Ricks*, 798 F.Supp. 605 (N.D.Cal.1992), *affirmed*, 31 F.3d 1478 (9th Cir.1994); *Fobbs v. Holy Cross Health System Corp.*, 789 F.Supp. 1054 (E.D.Cal.1992), *affirmed*, 29 F.3d 1439 (9th Cir.1994). Ordinarily, the defendants will move for a summary judgment based on the grant of immunity from damages, and appellate review is usually limited to reviewing the ruling on the summary judgment. *Id.* The pivotal question, therefore, is whether the defendants are immune from damages as a matter of law, which necessarily devolves into an inquiry of whether the physician has overcome the rebuttable presumption that the professional-review action met the standards in section 11112(a) of the HCQIA.[6] 42 U.S.C.A. § 11112(a)(1)–(4);

5. The Health Care Quality Improvement Act of 1986 provides immunity against liability, not against suit. *Manion v. Evans*, 986 F.2d 1036, 1042 (6th Cir.), *cert. denied sub. nom., Lima Memorial Hosp. v. Manion*, — U.S. —, 114 S.Ct. 71, 126 L.Ed.2d 40 (1993).

6. Section 11112(a) provides that, to obtain immunity from damages, a professional-review action must be taken: "(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after

*Maewal,* 868 S.W.2d at 891; *Austin,* 979 F.2d at 734. Two of the standards require that the professional review action must be taken "in the reasonable belief that the action was in furtherance of quality health care" and "in the reasonable belief that the action was warranted by the facts known after ... reasonable effort to obtain facts." 42 U.S.C.A. § 11112(a)(1), (4). Without the evidence and record developed during the review process, a court is substantially hindered in—if not precluded from—determining whether the participants met these two "reasonableness" requirements at the time they acted.

NON-INTERFERENCE PROMOTES JUDICIAL ECONOMY

This policy consideration recognizes that a court may never have to expend its judicial resources if a physician is required to exhaust the professional-review process before seeking judicial relief. In other words, Dr. Roe may have nothing to complain about if at the completion of the review process the final decision is favorable to him, rather than adverse.

OTHER CONSIDERATIONS

Considering the nature of professional review and the clear legislative intent underlying it, requiring Dr. Roe to exhaust the review process before seeking judicial relief promotes the public interest:

> A primary purpose [of the exhaustion doctrine] is, of course, the avoidance of premature interruption of the administrative process. The [administrative] agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise its discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to

permit the parties to seek aid from the courts at various intermediate stages.

*See McKart,* 395 U.S. at 192–95, 89 S.Ct. at 1662–63. Although taken from a case involving the Selective Service laws, we believe the principles inherent in the quoted excerpt are equally applicable here.

Congress and the legislature sanctioned the professional-review process for the express purpose of applying the national standards in the first instance. Application of those standards requires considerable discretion, special knowledge, and expertise. Obviously, the public interest is best served by an efficient, uninterrupted process of review. Finally, none of the traditional exceptions to applying the exhaustion doctrine are applicable here. *E.g., McCarthy,* 503 U.S. at 145–49, 112 S.Ct. at 1087–88; *City of Sherman v. Public Utility Com'n,* 643 S.W.2d 681, 683 (Tex.1983); *Texas State Board of Examiners in Optometry v. Carp,* 162 Tex. 1, 343 S.W.2d 242, 245 (1961); *Texas State Bd. of Pharmacy v. Walgreen Texas Co.,* 520 S.W.2d 845, 848 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.).

## AVAILABILITY OF MANDAMUS

■ Mandamus is only available to correct a clear abuse of discretion when there is no other clear and adequate remedy at law. *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992).

A CLEAR ABUSE OF DISCRETION

■ Considering the legislative intent evident in the statutes sanctioning and encouraging the professional-review process and the public interest served by an efficient and expeditious determination of whether Dr. Roe's professional conduct negatively affects the quality of medical care at the hospital—a question that lies within the peculiar expertise of those participating in the process, the court clearly abused its discretion when it issued the November 18 order interfering in the professional-review proceedings prior to

---

such reasonable effort to obtain facts and after meeting the requirements of paragraph (3)." 42 U.S.C.A. § 11112(a)(1)–(4) (West Pamph.1994).

A presumption arises that a professional-review action meets these standards, which can only be rebutted by a preponderance of the evidence. *Id.*

their exhaustion under the bylaws.[7] *See id.* Under the circumstances, the court's intervention was an act so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *See id.* at 839. Moreover, based on the facts before it, the court could have reasonably reached only one conclusion: Any judicial interference in the professional-review process prior to its completion under the bylaws would defeat clear legislative objectives and thus undermine the public interest. Finally, we treat the failure to properly analyze and apply the principles of the exhaustion doctrine as an erroneous legal conclusion, which is entitled to no deference on appellate review. *See id.* at 840.

### No Adequate Remedy at Law

Under the facts presented, Relators have no adequate remedy by appeal. Governmental policy not only favors but promotes the professional-review process as a means of advancing the public interest in quality health care. Texas law provides for an interlocutory appeal from the granting or denial of temporary injunctive relief.[8] Tex.Civ.Prac. & Rem.Code Ann. § 51.014 (Vernon Supp.1995). Although Relators have a legal remedy available for testing the propriety of the November 18 order, it is inadequate under the circumstances. Requiring Relators to pursue an interlocutory or direct appeal, with its often protracted delays preceding finality, will effectively vitiate and render illusory the very subject of the appeal: Did the court err when it interfered with the review process prior to its completion? *See Tipps,* 842 S.W.2d at 272. Without mandamus relief, Relators and the public will be deprived of the benefits of the professional-review process and, most importantly, the public interest served by an efficient and expeditious review process will be defeated. *Id.* at 272–73. Thus, a writ of mandamus is available. *See id.*

### DISPOSITION

We conditionally grant the writ of mandamus and direct Judge Altaras to vacate his order of November 18, 1994, to refrain from interfering with the hospital's professional-review process prior to its exhaustion under the procedures in the bylaws, and to abate all proceedings in No. C94–00244 on his docket pending exhaustion of the professional-review process. The writ will issue, however, only in the event that Judge Altaras does not promptly comply.

J.W.D., Appellant,

v.

---

**7.** Although our holding is in general accord with the result in *Huntsville Memorial Hosp. v. Ernst,* 763 S.W.2d 856, 858–59 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding), we do not rely on that decision for our holding.

**8.** Considering its legal substance and not the title bestowed on it by the court, the November 18 order is an injunction, not a continuance.